THE STATE OF OHIO, APPELLEE, *v.* McDONALD, APPELLANT.

(No. 6720—Decided February 9, 1972.)

*Mr. Robert E. Mohler,* prosecuting attorney, and *Mr. Stephen M. Gabalac,* for appellee.

*Mr. Timothy J. Murty* and *Mr. Samuel F. Adam,* for appellant.

VICTOR, J. The defendant, Daryl L. McDonald (appellant herein), was indicted, tried by jury, and convicted of the charge of possessing for sale a narcotic drug, cannabis sativa (marijuana), in violation of R. C. 3719.20(A) and two charges of the actual sale of such narcotic drug, in violation of R. C. 3719.20(B). He was sentenced to the Ohio State Penitentiary for those transgressions.

McDonald has filed an appeal in this court from those convictions. He says that:

"The court should have sustained the defendant-appellant's [McDonald's] motion for a directed verdict for the reason that the prosecution's case established entrapment as a matter of law."

He further says that:

" * * * his conviction under the * * * indictment violates due process of law and the equal protection of the laws of the Fourteenth Amendment to the Constitution of the United States for the reason that the classification of cannabis sativa as a narcotic by the Ohio legislature is an arbitrary and unreasonable classification.

"* * * the Ohio legislature, effective September 16, 1970 [before the date of McDonald's trial but subsequent to the return of the indictment], has reclassified cannabis sativa as a hallucinogen (see Section 3719.40, 3719.41; and * * * Section 3719.01(K) defining 'narcotic drugs' specifically designating cannabis [sativa] as being excluded from the definition of 'narcotic drugs.' "

An examination of this record reveals that on January 9, 1970, police officers, armed with a search warrant, searched the residence of one Wayne Lehman. They found a marijuana cigarette in the pocket of his sports coat. He told the officers that he had obtained marijuana from one Bob Atwood, and a person by the name of Daryl. Actually, he had never purchased marijuana from Daryl and had never talked to him about the purchase of any marijuana; he did not know where Daryl lived, or his telephone number. Lehman had met McDonald while both were in the Armed Services. When Lehman was shown a picture of McDonald, he identified him as the Daryl to whom he had referred.

Lehman agreed to cooperate with the police officers in an effort to purchase marijuana from McDonald. He secured McDonald's telephone number from Bob Atwood and called McDonald four or five times. The first time Lehman called, McDonald refused to sell any marijuana; on another occasion, McDonald said that he did not have any

but that he was going to get some. In Lehman's language, McDonald "seemed reluctant."

Lehman stated that he was refused probably three times, but that finally McDonald indicated that some marijuana was coming in, and a sale was arranged. The police officers supplied Lehman with money and a rendezvous was arranged at Schroeder's bar for February 5, 1970, at which time a purchase of five ounces of marijuana was made. In addition to the marijuana purchased, McDonald gave Lehman a marijuana cigarette. The purchase price was $75. Lehman had $40 in "police money" and agreed to get the other $35 at a later date, which he did. He paid it to McDonald at a place called Bubba's bar.

Thereafter, at the instance of the police officers, Lehman arranged to purchase more marijuana from McDonald and a meeting was set for March 2, 1970, at Bubba's bar. When Lehman arrived at the bar, together with one George Reuscher (a young police officer who was to pose as Lehman's partner), McDonald was not there. While Lehman was there, he was called to the telephone and informed by the caller, who was McDonald, that he was at the Jednota Club. Lehman and Reuscher proceeded to go to the Jednota Club where they met McDonald. Reuscher was introduced to McDonald as a partner of Lehman's. The three of them then left the bar and went to McDonald's car where McDonald showed Lehman and Reuscher several packages of keef. An ounce of keef was purchased for $150. Keef is a form of hashish and is a derivative of marijuana, but of a more refined and expensive type. After this sale, McDonald was placed under arrest.

Prior to this sale and while the three men were still in the Jednota Club, Reuscher and McDonald had a conversation about the drug business.

During the course of the trial, Officer George Reuscher testified in part as follows:

"Q. Could you tell us what type of conversation you had at that time while seated in the booth across from the defendant, Daryl McDonald?

"A. Yes, started out general conversation. He asked

me if I wanted to get into, as he said, quote, 'the business,' and I said, 'Well, I would like to. I don't know too much about it,' and I hadn't had much experience with the narcotics detail; so, I couldn't even fake my way through it too much. So, I said, 'No, I haven't had too much experience with it, don't know too much about it.'

"He asked me if I wanted to sell it for profit or use it myself or give it to friends, and I said, 'Frankly, I don't know; I don't know that much about it, whether I could make a profit or not.'

"He said, 'This type of substance'—he explained to me it was a kind of hashish. He called it keef, which I'd never heard of. He explained to me it came in different colors from a dark red up to a dark green. He said the red, the darker the red, the stronger it was. This was a kind of medium green. He said this was kind of on the borderline; he said the kind, what you call average hashish or keef.

"He noticed my wedding band, and he said, 'Does you old lady,' quote, 'turn on?' And I said, 'No, she doesn't know too much about it, my involvement in this, my getting into this.'

"I, I think he again mentioned, 'Was I going to sell it?'

"I said, 'I don't know too much about this type.'

"He said, 'You won't make too much profit on it, but you might break even,' but he said, 'Try it; see if you like it; give it to some of your friends.' He said, 'In a few days I've got a thousand dollar shipment coming in,' said 'I've got a partner named Buzz. If you both want to get in on it there might be some profit for you.'

"Q. Did you talk about purchasing any?

"A. Any of the shipment that was coming in?

"Q. No, buying anything from him that every [sic] evening?

"A. Yes, the hashish or the keef, as he called it, we talked about that. He brought out a small package said, 'This is what it looks like.'

"It was kind of a powder form, seemed like a resin,

stuck together in a cake-form. It did break very readily. He said if I wanted to sell it—he kind of opened it so you could see what was in his hand—said I could break it up. He said the easiest thing would be to use a table knife and I could break, measure it out on a small gram scale and sell it."

The defendant rested without offering any evidence.

Was the defendant entrapped?

" 'Entrapment' constitutes a valid defense if officers of the law inspire, incite, persuade, or lure a defendant to commit a crime which he otherwise had no intention of perpetrating." *People* v. *Toler*, 26 Ill. 2d 100, 185 N. E. 2d 874; *cert. denied*, 374 U. S. 813. (This is a case somewhat similar in its facts to the instant case.)

However, a person is not entrapped when an officer presents a defendant with the opportunity to commit an offense for the purpose of detecting a crime. Craft and pretense are available to officers of the law, and their agents, for such purposes. *Sorrells* v. *United States* (1932), 287 U. S. 435.

Headnotes 2 and 3 of *Sherman* v. *United States* (1958, 356 U. S. 369), reported in 2 L. Ed. 2d 848 read as follows:

"(2) Entrapment occurs only * * * [when the police] implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute * * *.

"(3) To determine whether [the defense of] entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal * * *."

Also:

"Innocent in the context of entrapment means that the defendant would not have perpetrated the crime for which he is presently charged but for the enticement of the police official."

*Hansford* v. *United States* (D. C. Cir. 196), 303 F. 2d 219, 222.

In our judgment, the record in the instant case does not show that McDonald was an "unwary innocent" in-

duced to make these sales solely by reason of the activities of the police officers. There is credible evidence in the record to establish that McDonald had the "predisposition and criminal design" to commit the acts which he claims he was entrapped into committing, and that he was merely provided with an opportunity to commit a crime for which he was "apt and willing." The trial court properly submitted the issue of entrapment to the jury.

McDonald contends further that the statute under which he was convicted, R. C. 3719.20 (A) and (B) is unconstitutional in that cannabis sativa was classified thereunder as a narcotic drug; that such classification is "arbitrary and unreasonable"; and that the legislature has reclassified it as an hallucinogen (R. C. 3719.40).

This issue is raised for the first time in this court. Ordinarily, questions not raised at trial cannot be raised for the first time on review. See *State* v. *Gordon* (1971), 28 Ohio St. 2d 45 and *State* v. *Lancaster* (1971), 25 Ohio St. 2d 83. This rule applies to the failure to assert constitutional rights. See *State* v. *Davis* (1964), 1 Ohio St. 2d 28.

However, we note that, notwithstanding the reclassification of cannabis sativa from a "narcotic drug" to a "hallucinogen," the penalty for the possession for sale, and the actual sale of such material, whether a narcotic drug or an hallucinogen, is the same. R. C. 3719.99 (D) and (F).

Defendant's contention in this regard is without merit.

We have examined all claims of error and find none prejudicial to the substantial rights of the defendant.

The judgment is affirmed.

*Judgment affirmed.*

DOYLE, P. J., and BRENNEMAN, J., concur.