THE STATE OF OHIO, APPELLEE, *v.*
MEHOZONEK ET AL., APPELLANTS.

(Nos. 45427, 45428, 45482, 45592 and 45688—Decided August 5, 1983.)

*Mr. John T. Corrigan,* prosecuting attorney, for appellee.
*Mr. Jeffry F. Kelleher,* for appellants.

JACKSON, J. Appellants, Victor Mehozonek, Clifton Whigham, Franklin D. Novak, and Sharon S. Brooks, appeal their convictions in the Court of Common Pleas of Cuyahoga County for grand theft, R.C. 2913.02.[1]

In the fall of 1981, officials of the security department of Ford Motor Company ("Ford") in cooperation with the police department of the city of Brook Park, developed a "sting operation" and staged a series of five thefts from the Ford manufacturing plant in that city. Five security guards who allowed the mock crimes to occur were indicted for and convicted of the offense of grand theft. Four of them have appealed their convictions to this court of appeals.

Appellant Victor Mehozonek was tried before a jury and found guilty on March 8, 1982. On March 26, 1982, appellants Novak and Whigham pled no con-

---

[1] The cases were originally assigned to separate common pleas court judges but later consolidated for trial. See appellate case Nos. 45427 and 45428, 45482, 45592 and 45688, respectively.

test. Appellant Brooks was found guilty by a jury on May 13, 1982. All four defendants were given suspended sentences of one to five years imprisonment, and placed on probation.

Neither Brooks nor Mehozonek presented any evidence at trial so the facts in all four cases are not in dispute. In August 1981, John Fonseca, a Ford employee, informed William Landers, the Manager of Plant Number One at the Ford factory complex in the city of Brook Park, that security guards were allowing employees to steal auto parts from the plant. At Landers' request, Fonseca thereafter held up to twenty-five meetings with Randall Dougall and Lawrence Fain (Ford security shift supervisors), George VanHaezebrouk (described as an upper level officer in the security division of Ford) and Timothy O'Rouke (a sergeant with the Brook Park Police Department). At these meetings, Fonseca, the Ford security personnel, and Sergeant O'Rouke planned an investigation of the Ford security guards. Specifically, Fonseca stated to the other men that the security guards would allow him (Fonseca) to remove Ford property from the premises. Fain, Dougall and VanHaezebrouk told him to "go ahead and do it." Landers, the plant manager, testified on cross-examination as follows:

"I had authorized the security people to do whatever they had to do to clean the mess up.

"* * *

"The delegation of authority in that meeting was to do what you have to do and plant one will foot the bill over and above what it normally cost you to put these people on the job."

The same plan was carried out against each of the appellants. Fonseca met the Ford security officials and Sergeant O'Rouke in the parking lot of a nearby restaurant before each operation. Fonseca was given $300 and fitted with a hidden radio transmitter. Fonseca entered the Ford plant, and then exited, carrying parts he had taken from the plant. He informed each of the appellants that he intended to take the parts. Each of the appellants allowed him to take the parts through the gate. Fonseca would return to the parking lot and give the parts to Sergeant O'Rouke.

In each instance Sergeant O'Rouke and Ford security personnel would listen to Fonseca and the appellants over the radio transmitter, and observe them through binoculars. They corroborated Fonseca's description of the events.

Each of the four appellants did more than simply look away while Fonseca took the auto parts from the Ford premises. Mehozonek and Brooks told Fonseca when the gate would be unguarded, but refused the bribes offered by Fonseca. Whigham described to Fonseca precisely how and when to remove property from the factory, and accepted a bribe of $170. Novak allowed Fonseca to store a box of parts under his desk and helped him to carry it to his car. He also accepted a bribe of $200.

The state's witnesses were obviously prepared to testify that Fonseca carried out this operation without the consent of Ford. They became evasive when asked whether Fonseca had permission to remove automobile parts from the plant. Landers, the plant manager, testified that an employee was allowed to take parts out of the gate only if he had a "pass" or a shipping document. When asked if the Ford security supervisors had given Fonseca permission to take the parts through the gate, Landers responded:

"If they gave the guard the permission to take that out — if they had given the guard permission to let that guy go through the gate, then they would be giving their permission. They didn't do that."

Lawrence Fain, security supervisor, was also asked whether Fonseca was operating with his permission. He responded:

"No sir. Not with my permission. John Fonseca again told us what he could do and we told him, if you can do that, do it."

In his testimony Fonseca also repeated this statement many times during the two trials. Nevertheless, the evidence clearly demonstrates that Fonseca did remove automobile parts from the Ford plant with the prior knowledge and consent of the company. Landers, the plant manager, testified that the security department was not under his supervision, that it did not need his permission to carry out this investigation, and that security had authority to do what was necessary in conducting the investigation. The officials of the Ford security department (Fain, Dougall and VanHaezebrouk) assisted in planning the investigation, and executed it with Fonseca several times. Fonseca was neither arrested nor disciplined for his role in the alleged thefts. In fact, Landers stated that Ford was trying to find more men like him.

I

In appellants' first assignment of error,[2] they contend that their convictions are against the manifest weight of the evidence and contrary to law because: (1) no crime occurred; (2) Fonseca had no criminal intent; and (3) Ford had consented to the removal of its property.

Before addressing the merits of this assignment of error, it is necessary to describe the procedural context of each of the four cases involved.

A. Procedural Context

Appellants Brooks and Mehozonek pled not guilty and were convicted by juries. It is their contention that the trial court should have directed a verdict in their favor, pursuant to Crim. R. 29,[3] on the ground that on the evidence no reasonable person could have found them guilty, beyond a reasonable doubt.

Appellants Whigham and Novak pled no contest and were convicted upon their pleas. A plea of no contest, in Ohio, is "an admission of the truth of the facts alleged in the indictment * * *." Crim. R. 11 (B)(2). In misdemeanor cases, the trial court has statutory authority to acquit a defendant who enters a plea of no contest, upon an "explanation of circumstances." R.C. 2937.07. No such statutory authority exists in felony cases. Moreover, the court need not have before it a factual basis for the plea. *State* v. *Ricks* (1976), 48 Ohio App. 2d 128 [2 O.O.3d 104]. However, the trial court is vested with discretion to accept or reject a no contest plea. *Cf. Brookhart* v. *Haskins* (1965), 2 Ohio St. 2d 36 [31 O.O.2d 20]; see, also, Annotation, Plea of Nolo Contendere or Non Vult Contendere, 89 A.L.R. 2d 540, 563-565. Where the facts presented to the trial court unequivocally negate an essential element of the offense charged in the in-

---

[2] Assignment of Error No. I:

"The state failed to prove that the alleged thefts were committed with the purpose to deprive the owner of its property or that they were done without the consent of the owner or person authorized to give consent, hence the convictions are against the manifest weight of the evidence and contrary to law."

Assignment of Error No. II:

(As to appellants Whigham and Brooks)

"Where a principal offender has already committed an offense, it is error to convict another of complicity in that offense for acts subsequent to the completion of the offense."

[3] Crim. R. 29(A) provides:

"The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case."

dictment, it is an abuse of discretion for the court to accept the no contest plea of the defendant. *State* v. *Cohen* (1978), 60 Ohio App. 2d 182 [14 O.O.3d 142].

It is the contention of appellants Whigham and Novak that the facts presented to the trial court at the hearings at which their no contest pleas were taken, unequivocally demonstrated that no crime occurred, and that the trial court should not have accepted their no contest pleas.

## B. Merits

An essential element of the crime of theft is the victim's lack of consent. Appellants were indicted under Subsection (A)(1) of R.C. 2913.02, which provides in relevant part:

"No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either:

"(1) *Without the consent of the owner or person authorized to give consent;*" (Emphasis added.)

Where an owner of property seeks to apprehend and prosecute a would-be thief, the law is clear that the owner may do no more than inform the authorities and lay in wait for the suspect. If the owner originates the criminal plan, for the purpose of testing the trustworthiness of an employee, the courts uniformly hold that an owner by his or its conduct has consented to the taking, and that no crime has been committed.

No more than a few citations of authority are necessary to demonstrate the settled nature of this rule.

"* * * And in *Williams* v. *State*, 55 Ga. 395, Mr. Justice BLECKLEY, in his usual clear and lucid style, puts the law thus: 'It seems to be settled law that traps may be set to catch the guilty, and the business of trapping has, with the sanction of courts, been carried pretty far. Opportunity to commit crime may, by design, be rendered the most complete; and, if the accused embrace it, he will still

be criminal. Property may be left exposed for the express purpose that a suspected thief may commit himself by stealing it. The owner is not bound to take any measures for security. He may repose upon the law alone, and the law will not inquire into his motive for trusting it. But can the owner directly, through his agent, solicit the suspected party to come forward and commit the criminal act, and then complain of it as a crime, especially where the agent to whom he has intrusted the conduct of the transaction puts his own hand into the *corpus delicti,* and assists the accused to perform one or more of the acts necessary to constitute the offense? Should not the owner and his agent, after making everything ready and easy, wait passively, and let the would-be criminal perpetrate the offense for himself in each and every essential part of it? It would seem to us that this is the safer law, as well as the sounder morality, and we think it accords with the authorities: 2 Leach, 913; 2 East, P.C. c. 16, § 101, p. 666; 1 Car. & M. 218; *Dodge* v. *Brittain,* Meigs, 86; *Kemp* v. *State,* 11 Hump. 320; *State* v. *Covington,* 2 Bail. 569. It is difficult to see how a man may solicit another to commit a crime upon his property, and, when the act to which he was invited has been done, be heard to say that he did not consent to it.' And, again, in *Love* v. *People,* 160 Ill. 508, (43 N.E. 713), Mr. Justice PHILLIPS says: '*It is safer law and sounder morals to hold, where one arranges to have a crime committed against his property or himself, and knows that an attempt is to be made to encourage others to commit the act by one acting in concert with such owner, that no crime is thus committed.* The owner and his agent may wait passively for the would-be criminal to perpetrate the offense, and each and every part of it, for himself, but they must not aid, encourage or solicit him that they may seek to punish.' " (Emphasis added.) *State* v. *Hull* (1898), 33 Ore. 56, 62-63, 54 P. 159.

"*In certain crimes consent to the*

*criminal act by the person injured eliminates an essential element of the offense,* and is, therefore, a good defense. *Where a person arranges for a crime to be committed against himself or his property and aids, encourages or solicits the commission thereof, such facts are a good defense to the accused.* However, if a person knows a crime is contemplated against his person or property, he may wait passively and permit matters to go on, or create the conditions under which the crime against himself may be committed, for the purpose of apprehending the criminal without being held to have assented to the act. * * *" (Emphasis added.) *State v. Burnette* (1955), 242 N.C. 164, 170-171, 87 S.E. 2d 191.

"* * * 'One who seeks to entrap another in the commission of larceny must take care that in his efforts he does not overreach himself and consent to the taking of his property.* Therefore, the setting of such trap must not go further than to afford the would-be thief the amplest opportunity to carry out his purpose, formed without such inducement on the part of the owner of the property as to put him in the position of having consented to the taking. * * * If the criminal design originates with the accused, and the owner or his agent or servant does not suggest the design or actively urge the commission of the crime, the mere fact that the owner, suspecting the accused, in person or through his servant or agent exposes the property, neglects to protect it, or furnishes facilities for the execution of the criminal design, under the expectation that the accused will take the property or avail himself of the facilities furnished, will not amount in law to a consent, although the agent or servant, by the instructions of the owner, appears to co-

operate in the execution of the crime.' * * *" (Emphasis added.) *Averett v. State* (1963), 246 Miss. 49, 58-59, 149 So. 2d 320.

"* * * *The authorities are abundant and the law unquestioned, that a taking by the voluntary consent of the owner * * * [or] his authorized servant or agent, even though with a felonious intent, does not constitute larceny.* But where the criminal design originates with the accused, and the owner does not in person or by an agent or servant suggest the design nor activity [*sic*] urge the accused on to the commission of the crime, the mere fact that such owner suspecting that the accused intends to steal his property in person or through a servant or agent exposes the property or neglects to protect it or furnishes facilities for the execution of the criminal design under the expectation that the accused will take the property or avail himself of the facilities furnished, will not amount to a consent in law even though the agent or servant of such owner by his instructions appears to co-operate in the execution of the crime. * * *" (Emphasis added.) *Lowe v. State* (1902), 44 Fla. 449, 451-452, 32 So. 956.

Numerous courts have reached the same conclusion: if the owner of property solicits, encourages, or substantially and affirmatively assists in the taking of his own property, there is no indictable offense. See, *e.g., State v. Neely* (1931), 90 Mont. 199, 300 P. 561; *McGee v. State* (Tex. Crim. 1902), 66 S.W. 562; *Love v. People* (1896), 160 Ill. 501, 43 N.E. 710; *Topolewski v. State* (1906), 130 Wis. 244, 109 N.W. 1037. See, generally, Annotation, Larceny: Entrapment or Consent, 10 A.L.R. 3d 1121; 50 American Jurisprudence 2d 316, Larceny, Section 139.[4]

It is irrefutable that the criminal

---

[4] The defense of entrapment is distinguished from the element of lack of consent of a victim. Typically, the defense of entrapment is raised in prosecutions of offenses where there is no specific victim, such as narcotics or prostitution cases. In such cases, even if agents for the state solicit the commission of the crime, the defendant may be found guilty if it is proven, beyond a reasonable doubt, that he or she was "predisposed" to commit the offense.

scheme, in the case at bar, was approved by and conducted under the supervision of security officials of Ford as a method of testing the loyalty and honesty of the security guards. Fonseca solicited the assistance of each of the security guards, appellants herein, and in each instance it was Fonseca who removed the allegedly stolen property from the premises of the Ford plant. If this had been an actual theft, the conduct of the guards would no doubt constitute "aiding and abetting," a violation of R.C. 2923.03. In fact, however, the appellants did no more than assist in the commission of a mock crime.

The purpose of our criminal justice system is to apprehend, punish and rehabilitate wrongdoers. It is not the purpose of our system to determine who is, and who is not, susceptible to the temptation to violate the law. An employer may have a legitimate economic reason for surreptitiously exposing his employees to a test of honesty, by arranging a fake crime. Society has no legitimate interest in punishing those employees who fail the test. These principles of law are so well-settled, that this court is surprised that this matter was prosecuted, let alone submitted to a jury. This case represents the deliberate use of public resources to reprimand the employees of a private corporation for violation of company rules. The first assigned error has merit.

## II

In the second assigned error, appellants Whigham and Brooks contend that since Fonseca had already removed

property from the Ford plant before communicating with them, that they were guilty of no more than being "accessories after the fact," conduct which is recognized as a criminal offense in Ohio. *State* v. *Lingafelter* (1908), 77 Ohio St. 523. However, both appellants, as security guards, gave Fonseca advice or assistance in moving the allegedly stolen property through the gates and off the company premises. Their conduct was contemporaneous with the taking of the property. Therefore, the second assigned error is overruled.

Accordingly, this court is persuaded that the convictions of appellants Brooks and Mehozonek must be reversed, and judgment of acquittal is entered as to both defendants. This court further concludes that the convictions of appellants Whigham and Novak must be reversed on the ground that the trial court abused its discretion in accepting their pleas of nolo contendere, and their cases are remanded to the trial court for further proceedings consistent with this opinion.

*Judgment accordingly.*

HOFSTETTER, J., concurs.

PATTON, C.J., concurs in judgment only.

HOFSTETTER, J., retired, of the Eleventh Appellate District, was assigned to active duty pursuant to Section 6(C), Article IV, Constitution.

---

*Sorrells* v. *United States* (1932), 287 U.S. 435; *State* v. *McDonald* (1972), 32 Ohio App. 2d 231 [61 O.O.2d 252]; *State* v. *Dutton Drugs, Inc.* (1965), 3 Ohio App. 2d 118 [32 O.O.2d 204]. The "predisposition" test is commonly referred to as the "subjective" test of entrapment.