The STATE of Ohio, Appellee,

v.

BLACK ON BLACK CRIME, INC., Appellant.

[Cite as *State v. Black on Black Crime, Inc.* (2000), 136 Ohio App.3d 436.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 74726.

Decided Jan. 10, 2000.

438

*William D. Mason,* Cuyahoga County Prosecuting Attorney, and *James Gutierrez,* Assistant Prosecuting Attorney, for appellee.

*Kenneth D. Myers,* for appellant.

———————

SPELLACY, Judge.

Defendant-appellant, Black on Black Crime, Inc. ("Black on Black"), appeals its conviction for grand theft in violation of R.C. 2913.02.

Appellant assigns the following errors for review:

"I.   The trial court erred in overruling appellant's Crim.R. 29 motion for acquittal made both at the end of the state's case and at the end of defendant's case.

"II.   The evidence is legally insufficient to support a verdict of guilty for the offense of theft by deception."

Finding the appeal to lack merit, the judgment of the trial court is affirmed.

I

Arthur McKoy founded Black on Black approximately thirty years ago with the intent of helping the community.   McKoy became the president of the organization.   He was the spokesperson for Black on Black and dealt with any citizens who were interested in the group or who had complaints.   Black on Black maintained a good relationship with the city of Cleveland.   Black on Black incorporated on January 19, 1994, in order to gain nonprofit status.   Black on Black never received a large number of donations and had little cash to work with over the years.   Dues consisted of whatever a member could afford.   All of the members were volunteers.   The organization's bank account usually had a balance of between $100 and $500.

In 1996, Black on Black administered a program called "Because We Care." The primary purpose of the program was to provide affordable daycare and tutoring.   The program received a $10,000 matching grant from Cleveland and was assigned a vendor number by the city.   Cleveland would reimburse Black on Black for documented expenses that were determined to be acceptable.   Cleveland would wire the funds to Black on Black's bank account.   The program ended early after only using approximately $3,000 of the matching grant.

On April 1, 1997, Cleveland mistakenly caused $617,596.99 to be wired into Black on Black's bank account.   Apparently, a data entry clerk entered Black on Black's vendor number instead of the correct vendor number of a power company

that was owed money by Cleveland. Cleveland had paid the invoice to the power company the previous week. Cleveland did not discover the error for five months until August 27, 1997. The actions of the leadership of Black on Black after the money was discovered in the group's bank account led to the criminal indictment of Black on Black and five of its members. Cleveland also filed a civil suit in an effort to reclaim the errant funds.

Black on Black learned of the sudden increase in its fortunes in April or May 1997, when Abdul Hasan, the chairman of the organization, entered a KeyBank office and inquired of Gwendolyn Wren about the status of Black on Black's bank account. Wren was familiar with both Hasan and McKoy because they were often in the bank. Wren informed Hasan that over $600,000 was in the group's account. Hasan was astounded at the amount and stated that there must be a mistake. Wren checked with KeyBank's wire room and then told Hasan that the money came from the city of Cleveland, National City Bank. Wren stated she told Hasan to telephone National City Bank if he had any further questions or wanted verification regarding the amount of money and the source.

An anonymous wire transfer is not possible under federal law. The Federal Reserve Bank requires that the originator be stated in a customer transfer. In the normal course of business, KeyBank sends a wire transfer recipient a notice or confirmation of the credit showing the sequence number, amount, and the originator. The sequence number is unique to that transaction and can be used to trace the money sent in the wire transfer. The notice is sent to the same address as is shown on the customer's bank statement. Black on Black should have been mailed a notice on April 1, 1997. The notice would have been mailed to the same address to which all of Black on Black's bank statements are sent, a barbershop owned by McKoy.

McKoy testified at trial that Hasan told him about the money in April. McKoy stated that he instructed Hasan to check with the bank to make sure the money actually belonged to Black on Black. Hasan returned the following week and informed McKoy that, according to the bank, the money really was in their bank account. A month later, McKoy asked Hasan to contact an attorney and an accountant to determine what should be done with the funds. Hasan still maintained he could not discover the source of the money. McKoy averred that he guessed that the money may have been a donation from either Albert Belle or Mike Tyson.

In early May, Hasan and McKoy used some of the money to purchase a jumbo certificate of deposit. On May 28, 1997, McKoy, Hasan, and Derrick Washington, a member of Black on Black, returned to KeyBank and closed out the jumbo certificate of deposit. Donna Pinkney, the bank manager, told the men that there would be a penalty of approximately $5,500 for closing the certificate of deposit

early but the men did not care. McKoy and Hasan had discussed the penalty they would incur by closing the certificate of deposit before going to the bank. McKoy and Hasan signed the certificate of deposit withdrawal. The withdrawal amounted to $395,836.28 after the penalty was deducted. The men requested that four cashier's checks be drawn up with the proceeds from the certificate of deposit. Washington received a cashier's check for $135,000, Hasan's check was for $235,000, Larry Penn received a check for $135,000, and $85,000 was given to Eric Norvell. McKoy did not receive a check after stating he did not want any money. Money from Black on Black's bank account was used to make up the difference between the total amount of the checks and the proceeds from the jumbo certificate of deposit.

The money was to be used to fund four different companies. Hasan was to be in charge of a construction company, Norvell headed a bonding company to help people raise their bond money, Penn was in charge of "Fun Tours," and Washington already had his own insurance company. The money was discussed at executive sessions but never at general meetings. The general members were not told that Black on Black had received a large amount of money or any money at all. Donations still were being solicited from members to fund various projects. It was agreed at an executive session that Hasan would be in charge of the money.

Washington first mentioned Fun Tours to Penn. Penn knew little about the company he was to head other than it primarily arranged travel for people who could not afford to visit imprisoned family members. Hasan gave Penn the check for $135,000. Hasan and Washington accompanied Penn to the bank to deposit the check. Washington gave the bank an identification number to use on the accounts Penn opened. Penn obtained a $24,000 cashier's check from the money. The check was used to buy a Mercedes Benz.

Earlier, Washington had contacted a Mercedes Benz dealer and arranged to purchase a 1991 Mercedes Benz. Washington called the dealer again from the bank to make further inquiries about the vehicle. Washington arrived at the dealership with Hasan and two other people. Washington had a check for the automobile in his hand. Washington purchased the Mercedes Benz in the name of Fun Tours. Hasan drove the car from the dealership and thereafter. Washington also bought a used Cadillac through the insurance company that Washington owned for Penn to drive. The title to the Cadillac was transferred to Fun Tours. Penn reimbursed the Excellent Insurance Agency for the Cadillac from the Fun Tours account. Penn drove the Cadillac but, apparently, never used the vehicle to transport anyone to prison for visitation. Penn did not purchase any other vehicles such as vans for Fun Tours because McKoy did not want any more money spent. Penn testified that McKoy was upset upon learning about the

purchase of the two luxury vehicles. McKoy thought use of expensive automobiles by Penn and Hasan reflected badly on Black on Black. McKoy further stated that if someone came looking for the money or inquiring about the money, then Black on Black had better have all the money to return.

Hasan put $135,000 in his checking account and $100,000 in a savings account. Hasan used money to pay a contractor for repairs that were supposed to be done on property purchased with the money. Hasan's son received $20,000. A check for $2,000 went to Hasan's father. Norvell also paid Hasan's son from the $85,000 that he received. McKoy's daughter received a salary from Black on Black.

Washington divided his money into a corporate checking account in the name of his insurance company, Excellent Insurance Agency, and a personal savings account. Washington spent all but $112 of the $100,000 that he put in his corporate account. Washington used the corporate account to pay the sewer and water bills for his home. The $35,000 Washington deposited into his personal account was co-mingled with funds Washington received from the Veterans Administration. The account had a negative balance by September 1997. Washington spent $15,000 on some property that he purchased in the name of the Excellent Insurance Agency from the city of Cleveland. Washington's and Hasan's banking statements were sent to the same post office box.

These expenditures were not permissible for a nonprofit corporation. Assets or earnings of such an organization cannot be used for some private benefit or to benefit private individuals or interests. The nonprofit corporation's funds must be used to further charitable purposes. A nonprofit corporation is not allowed to purchase real or personal property and title it in the name of a private individual or company. Assets cannot be distributed out of the charity because the nonprofit corporation no longer would have control over the assets. Financial assets of the nonprofit organization cannot be distributed to officers or members of the charity in the form of checks with no control over how the funds are spent.

On August 27, 1997, Cleveland finally discovered the error. The city treasurer contacted Black on Black's attorney and eventually met with the attorney. The city treasurer demanded that Black on Black return the funds immediately. Black on Black's attorney proposed a payment plan, which the city treasurer rejected. The city treasurer wanted full repayment at once.

In September 1997, McKoy, Hasan, Washington, and Penn met together after Black on Black admitted discovering Cleveland was the source of the money. Hasan directed Penn to withdraw $20,000 from the bank in cash. Penn accompanied Hasan to the office of Black on Black's attorney where Penn left the money on the attorney's desk.

McKoy testified that he considered himself to be the spokesperson for Black on Black and that he was not involved in the financial aspects of the organization. Hasan was responsible for the group's banking and other financial transactions and concerns. McKoy stated that he relied on Hasan to determine the source of the money that appeared in Black on Black's bank account and what could be done with the money. McKoy denied having any idea about where the money came from but thought Belle or Tyson gave the money anonymously. McKoy averred he did not learn the money belonged to Cleveland until late August or early September. McKoy never asked KeyBank himself about the source of the money. McKoy testified that he did try to contact Belle and Tyson but was unsuccessful in his efforts. McKoy stated that it never occurred to him that Cleveland might be the source of the money.

Hasan, McKoy, and Washington and two other members of Black on Black were arrested for aggravated theft. Black on Black also was indicted on a charge of aggravated theft. Cleveland filed a civil lawsuit against Black on Black and various officers and members of the organization. The jury returned guilty verdicts against Black on Black, Washington, McKoy, and Hasan for grand theft. The trial court fined Black on Black $10,000 as a result of the conviction.

## II

In its first assignment of error, Black on Black argues the trial court erred by overruling Black on Black's Crim.R. 29 motion for acquittal. Black on Black contends that the case should have been civil and not criminal and that the prosecution failed to prove Cleveland's lack of consent.

A trial court is required to grant a motion for acquittal made pursuant to Crim.R. 29 if the evidence is insufficient to support a conviction for the offense. *State v. Pickett* (1996), 108 Ohio App.3d 312, 314, 670 N.E.2d 576, 577–578. A trial court shall not grant a Crim.R. 29 motion "if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus.

Sufficiency is a legal standard that is applied to determine whether the evidence admitted at trial is legally sufficient to support the verdict as a matter of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541.

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus.

■ In essence, sufficiency is a test of adequacy. Whether the evidence presented in a case is legally sufficient to sustain a verdict is a question of law, and a conviction based upon legally insufficient evidence constitutes a denial of due process. *Thompkins, supra.*

Black on Black initially contends that Cleveland should have confined its efforts to regain the money by securing a civil judgment against it and not by seeking an indictment. Black on Black points out that it did not participate in causing the money to be wired into its bank account. Further; Black on Black did not refuse to give the money back once Cleveland discovered the error.

■ The state may charge a defendant under any statute that proscribes the particular criminal behavior involved. *State v. Garland* (1996), 116 Ohio App.3d 461, 688 N.E.2d 557. R.C. 2901.23 provides:

"(A) An organization may be convicted of an offense under any of the following circumstances:

"* * *

"(4) If, acting with the kind of culpability otherwise required for the commission of the offense, its commission was authorized, requested, commanded, tolerated, or performed by the board of directors, trustees, partners, or by a high managerial officer, agent, or employee acting in behalf of the organization and within the scope of his office or employment."

■ An organization includes a not for profit corporation. R.C. 2901.23(D).

"Pursuant to R.C. 2901.23(A)(4), a business entity may be found guilty of a criminal offense only if the criminal act or omission was approved, recommended, or implemented by high managerial personnel with actual or implied authority to approve, recommend or implement same. High managerial personnel are those who make basic corporate policies." *State v. CECOS Internatl., Inc.* (1988), 38 Ohio St.3d 120, 526 N.E.2d 807, at paragraph one of the syllabus.

■ Liability may be imposed upon an organization even if high managerial personnel are not indicted but were actively involved in the criminal conduct for which the organization is indicted. *State v. Beehive Ltd. Partnership* (1993), 89 Ohio App.3d 718, 627 N.E.2d 592.

■ Two of Black on Black's officers pled guilty prior to trial. Three other officers or members were found guilty of grand theft. The indictment against Black on Black showed the dates of the offenses as being from May 28, 1997 through September 5, 1997. May 28, 1997, was the day McKoy and Hasan closed

the certificate of deposit and caused most of the money to be distributed to Hasan, Washington, Norvell, and Penn. The prosecution presented evidence at trial showing that these four persons were in high managerial positions at Black on Black and engaged in a pattern of criminal conduct with regard to the money wired into Black on Black's bank account. Money was given to family members of the men, expensive automobiles were purchased for their personal use, personal bills and expenses were paid, and, generally, the money was spent in ways that did not further the charitable purposes of Black on Black as a nonprofit corporation. The behavior of Black on Black's officers certainly supported a criminal indictment.

Black on Black contends there was no evidence of deception admitted at trial. "Deception" as defined in R.C. 2913.01(A), includes deceiving another by withholding information. The state presented evidence at trial that Hasan was told the source of the funds that mysteriously appeared in Black on Black's bank account. There was evidence that a document showing the source of the money should have been sent to McKoy's barbershop. Hasan also was told he could call National City Bank if he had any questions about the money deposited into the bank account. Black on Black's officers deceived the general membership by never telling them about the money. Therefore, there was evidence admitted at trial showing that Black on Black knew Cleveland was the source of the monies but withheld the information from Cleveland while the funds were dissipated. When viewed in the light most favorable to the state, there was sufficient evidence of deception admitted at trial.

Black on Black also contends that the state failed to prove Cleveland did not consent to Black on Black's use of the money. Black on Black states that Cleveland consented to Black on Black's control over the funds because Cleveland caused the money to be wired into the bank account. Further, Black on Black maintains that this consent continued until Cleveland discovered the error five months later.

Black on Black relies on *State v. Mehozonek* (1983), 8 Ohio App.3d 271, 8 OBR 364, 456 N.E.2d 1353, in which this court held that a theft does not occur if the owner of the property solicits, encourages, or substantially and affirmatively assists in the taking of his own property. *Mehozonek* is not controlling in the instant case. Cleveland only could have substantially and affirmatively assisted in the taking of its property if it knew Black on Black would steal the property at the time the money was wired into the account or if Cleveland had realized the funds mistakenly were placed under Black on Black's control and allowed Black on Black to continue using the monies. Cleveland did not realize the money had been given to Black on Black and had no intention of giving the funds to Black on Black. Sufficient evidence was admitted at trial proving that Cleveland did not

consent to Black on Black's control over the money. The trial court did not err in denying Black on Black's Crim.R. 29 motion for acquittal.

Black on Black's first assignment of error lacks merit.

## III

Black on Black's second assignment of error again challenges the sufficiency of the evidence supporting its conviction for grand theft. Black on Black submits that the state's evidence showing Black on Black purposefully deprived Cleveland of its property was too insubstantial to uphold the conviction for grand theft. Black on Black argues that the intent to deprive must have existed at the time the money was wired into its account for it to be culpable under the theft statute.

Black on Black relies upon *State v. Metheney* (1993), 87 Ohio App.3d 562, 622 N.E.2d 730, in which the Ninth District Court of Appeals found that insufficient evidence was admitted at trial to uphold the defendant's conviction for theft in office. The court reasoned that the state failed to prove the defendant did not intend to pay for electricity when she received it.

■ Black on Black maintains there was no evidence that it intended to deprive Cleveland of the money at the time the money was wired into Black on Black's bank account. It is Black on Black's position that the intent to deprive had to have been present at the moment the funds were transferred into its account.

Under Black on Black's theory of what constitutes a theft offense, Black on Black had free reign to do whatever it wished with the money because Black on Black did not discover the funds were in its account until after the transfer took place. Therefore, as long as Black on Black attempted to return the property upon Cleveland's discovery of the mistake, Black on Black's actions regarding the funds in the interim could not be criminal in nature.

On May 28, 1997, Black on Black exerted control over Cleveland's money by distributing the funds to four of its officers and members. This was the point at which Black on Black purposefully sought to deprive Cleveland of its property. *Metheney* is distinguishable from the instant case. In *Metheney,* the state sought to prove the defendant stole the electricity at the time it entered her residence. In the instant case, the state sought to prove that Black on Black first purposefully deprived Cleveland of the money on May 28, 1997, and not when the money was initially wired into the organization's bank account. Under R.C. 2913.01(C)(1), "to deprive" includes withholding "property of another permanently, or for a period that appropriates a substantial portion of its value or use * * *." The actions of the officers of Black on Black showed a purpose to deprive Cleveland of its money by withholding the property until Cleveland

discovered the error. In any event, it was after Black on Black, by its own admission, had discovered Cleveland was the source of the money, that Hasan met with McKoy, Washington, and Penn in September 1997 and directed Penn to withdraw $20,000 from the bank in cash.

█ Last, Black on Black contends a mistake of fact regarding this financial matter absolves it of any criminal culpability. Black on Black argues that it did nothing to hide the fact that it received the money. Further, Cleveland always had the ability to discover the whereabouts of its funds by looking at Cleveland's own records.

Black on Black relies upon *State v. Baumgarden* (1988), 49 Ohio App.3d 24, 550 N.E.2d 206, in which the Twelfth District Court of Appeals reversed the defendant's conviction for theft by deception. The defendant, the general manager of a business, wrote himself a number of checks from company funds. The checks were recorded on the company's records, creating an accounting and auditing trail that anyone at the company could have followed to discover the unauthorized checks. The court noted that the defendant was not indicted for writing the checks without the consent of the business's owner but for theft by deception.

In the instant case, Black on Black was indicted for both theft by deception and for theft without the consent of the owner or person authorized to give consent. *Baumgarden* is not persuasive authority in this instance. As stated above, there was no evidence Cleveland consented to Black on Black's use of its property.

Black on Black's second assignment of error lacks merit.

*Judgment affirmed.*

KARPINSKI, P.J., and TIMOTHY E. MCMONAGLE, J., concur.