OPINION
{¶ 1} Defendant-appellant Robert F. Taylor appeals from his convictions for Theft by Deception, Forgery, and Uttering a Forgery. He contends that the State failed to put forth sufficient evidence of Theft by Deception under R.C. 2913.02(A)(3), so that the trial court erred in denying his Crim.R.29(A) motion for judgment of acquittal. Additionally, Taylor claims that his convictions for Forgery and Uttering under R.C.2913.31 are against the manifest weight of the evidence, because he had consent to sign the name of his fiancee, Jewell Dowdell, to these checks.
 {¶ 2} We conclude that sufficient evidence of deception for purposes of R.C. 2913.02(A)(3) is shown when an individual deposits a check, knowing that it will later be dishonored, for the purpose of gaining access or control over another's funds. Furthermore, Taylor's convictions for Forgery and Uttering are not against the manifest weight of the evidence. Although Dowdell may have given Taylor authority, generally, to sign her name, there is no evidence that this general authority included the authority to sign her names to checks that were clearly insufficiently funded, in the pursuit of a criminal purpose. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} Taylor operated a business known as Ohio Community Reinvestment Partners (the company). The company's purported purpose was to buy and rehabilitate real property in the Dayton area. Taylor named Dowdell President of the company, and he acted as its Secretary.
 {¶ 4} After doing some research, Taylor asked Dowdell to open an account with State Farm Bank in Bloomington, Illinois on-line. The account was in Dowdell's name, but was established for the benefit of the company. She was the only person authorized to sign checks on the account. Dowdell neither wrote checks on the account nor reviewed the monthly statements.
 {¶ 5} Taylor wrote several checks on the account, signing Dowdell's name to checks that subsequently bounced. The first check was made payable to Midland Title Company for $175,000. Midland Title acted as a closing agent in a real estate transaction between Taylor and the Culvahouses. The day of the scheduled closing Taylor admitted that he did not have the money to go forward with the purchase, so the parties executed a "dry closing," i.e., the papers were signed, but the deal was not closed until Taylor could provide the money to purchase the property. Taylor eventually wrote a check on the account to pay for the purchase. Taylor signed Dowdell's name to this check. Later, upon the belief that this check had cleared, based upon representations of its own bank, Midland Title disbursed funds to the Culvahouses and deeded the property to Taylor. A few days later, Taylor's check was returned for insufficient funds. Consequently, National City (Midland Title's bank) charged back the amount of the check to Midland Title's escrow account. Taylor never made good on this check with Midland Title. But he did quit-claim deed the property to Dowdell.
 {¶ 6} During this same time, Taylor pitched his ideas about buying and rehabilitating old houses to people in the community, so that he could secure investors in the company. He met with several members of a Dayton area mosque, including Yusuf Hasan, Muhammad Musa, and Ahmad Bilal. He subsequently convinced these men to open checking accounts in the Dayton area. Husan opened a business checking account with Key Bank in the name of Carpenter's Investment. Husan also opened a business checking account jointly with Bilal and Musa at Fifth Third Bank. The initial accounts were funded with three checks drawn on the State Farm account. Again, Taylor signed Dowdell's name to these checks. A few days after opening the account, he requested that the men go to the banks and to withdraw funds from the accounts, which they did, giving the funds to Taylor. Again, the checks drawn on the State Farm account were returned for insufficient funds. The amounts of the checks were charged back against the accounts. Because the banks had paid cash in reliance upon the checks, Key Bank suffered a loss of $2,450 and Fifth Third Bank incurred a loss of $2,500.
 {¶ 7} Eventually, Midland Title contacted authorities. Susan Neely, an investigator with the prosecutor's office, made contact with Dowdell at her home to discuss the check for $175,000. Dowdell stated that she had never seen the check before, but that Taylor might know something about it. Neely spoke with Taylor, who admitted writing the check. He also acknowledged that he did not have Dowdell's permission to sign the check, and that he knew that there were insufficient funds in the account to cover the check.
 {¶ 8} Neely then contacted State Farm Bank, which provided her with copies of other checks from the account that had been dishonored. Neely went back to Dowdell's house the next day to speak to Taylor about these other checks. He again admitted to signing Dowdell's name to each check, and that there were insufficient funds in the account to cover the checks. Neely then arrested Taylor.
 {¶ 9} Taylor was indicted for one count of Theft by Deception of property having a value of $100,000 or more, two counts of Theft by Deception of property having a value of $500 or more, two counts of Forgery of a check having a value of $100,000 or more, and six counts of Forgery of a check having a value of $5,000 or more. After a jury trial, defense counsel moved for acquittal on each count under Crim.R.29, which was denied. Taylor was found guilty of each charge and was later sentenced to a total term of ten years and was ordered to make restitution. From his conviction and sentence, Taylor appeals.
 II {¶ 10} Taylor's first assignment of error is as follows:
 {¶ 11} "THE EVIDENCE PRESENTED TO THE JURY, WITH RESPECT TO COUNTS 1, 4, AND 5, WAS INSUFFICIENT FOR A FINDING OF GUILTY AND THE TRIAL COURT ERRED IN NOT SUSTAINING DEFENDANT'S MOTION TO DISMISS PURSUANT TO CRIM.R29."
 {¶ 12} Taylor argues that the State's evidence of deception was insufficient to sustain his convictions for Theft by Deception in violation of R.C. 2913.02(A)(3). He contends that he did not deceive National City Bank into believing that a check had cleared and reporting that information to Midland Title. He also argues that he did not deceive Key Bank and Fifth Third Bank into allowing withdrawals from those accounts before checks passed through the normal accounting procedure. He relies upon State v. Baumgarden (1988), 49 Ohio App.3d 24, 550 N.E.2d 206, where the court of appeals overturned a defendant's conviction of Theft by Deception, based upon its determination that no reasonable trier of fact could have found for the State on the element of deception when defendant, who had written 35 checks to himself on his company's account, always recorded the checks on the company's books creating "an accounting and auditing trail that anyone might follow[,]" to support his claim.
 {¶ 13} Taylor was charged with Theft by Deception of over $100,000 against Midland Title Company in Count 1 and with Theft by Deception over $500 against Fifth Third and Key Bank under R.C. 2913.02(A)(3) in Counts 4 and 5.
 {¶ 14} To reverse Taylor's criminal convictions for Theft by Deception pursuant to R.C. 2913.02(A), we must conclude, after reviewing the evidence in a light most favorable to the State, that no rational trier of fact could have found all the elements of R.C. 2913.02(A)(3) to have been proven beyond a reasonable doubt. State v. Thompkins,78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. The trial court is required to grant a motion for a judgment of acquittal, made pursuant to Crim.R.29, if the evidence is insufficient to support a conviction for the offense. State v. Black on Black Crime, Inc. (2000),136 Ohio App.3d 436, 736 N.E.2d 962.
 {¶ 15} R.C. 2913.02 provides in relevant part:
 {¶ 16} "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or the services in any of the following ways: * * *
 {¶ 17} "(3) By deception[.]"
 {¶ 18} Deception, as defined for the purposes of this statute, includes:
 {¶ 19} "[K]nowingly deceiving another or causing another to bedeceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by anyother conduct, act, or omission that creates, confirms, or perpetuates afalse impression in another, including a false impression as to law,value, state of mind, or other objective or subjective fact." R.C.2913.01(A) (emphasis added). Accordingly, the prosecution had to prove beyond a reasonable doubt that Taylor, with intent to deprive Midland Title, Fifth Third, and Key Bank of property, knowingly obtained money from them by deception — that is, by knowingly deceiving, or causing them to be deceived by any false or misleading representation, by withholding information, or by any conduct, act, or omission that creates, confirms, or perpetuates a false impression.
 {¶ 20} We conclude that the evidence in the record supports a finding that Taylor knowingly deprived Midland Title, Key Bank, and Fifth Third of money by means of deception.
 {¶ 21} Taylor presented a bank slip to Midland Title evidencing his deposit of a check for $175,000. There is evidence that Taylor knew that there were not funds in the account to cover the amount of this check. Neely testified as follows:
 {¶ 22} "A. [Taylor] came out, I introduced myself again, the same way I did to Jewell and advised him I'd like to talk to him about this check * * * [made payable to Midland Title] for $175,000.
 {¶ 23} "Q. And was he willing to talk to you about it?
 {¶ 24} "A. Yes, he was.
 {¶ 25} "Q. And what happened after that? What did you ask him, if anything?
 {¶ 26} "A. I showed him the check and at that time we were sitting on the front porch and I asked him, I said, Mr. Taylor, did you write this check? And he advised that he did, in fact, write this check. And I asked him, I said, did you have Jewel's permission to write this check? And he said, no, he did not. And I further asked him, I said, well you knew at the time that this check was written that there was not sufficient funds in the account and he advised that that was, in fact, the truth. At that point, we, I advised him, said, you know, Mr. Taylor, it is a crime in the state of Ohio to write a check when you do not have sufficient funds in the account and I'm going to have to check with my boss and get back with you. He advised me that he was working on getting the funds from different private investors and from a bank. But I advised him that obviously you can't write a check on funds that are possibly coming in."
 {¶ 27} This act amounts to deception contrary to Taylor's protestations. Cf. State v. McGhee (1996), 113 Ohio App.3d 208,680 N.E.2d 710. Based on a mistaken belief that this check was good, Midland Title disbursed funds to the Culvahouses and deeded property to Taylor. Later, due to the fact that the check was returned dishonored, Midland Title's escrow account was debited in the amount of $175,000. Obtaining money or other things of value by means of presenting a check, knowing that there are insufficient funds in the account upon which the check is drawn, so that nothing of value will pass to the person giving up the money or other things of value, constitutes Theft by Deception.State v. Cooper (2001), 112 Ohio Misc.2d 52, 753 N.E.2d 289. By exchanging a check for value, the person presenting it implicitly represents that he does not know the check to be worthless.
 {¶ 28} Likewise, Taylor directed Hasan, Musa, and Bilal to open checking accounts with checks drawn on an account with insufficient funds:
 {¶ 29} "Q.* * * [W]ere those three checks [including the two checks used to open the checking accounts] also the subsequent matter of your discussions with [Taylor] * * *.
 {¶ 30} "A. Yes, they were.
 {¶ 31} "Q. And what, tell the jury what you asked the defendant with regards to those three checks and what his responses were?
 {¶ 32} "A. All — I went over all the materials that we received from State Farm and these three checks were included with the subpoenaed information from State Farm. And just the same as I did the first day, I went in order of the way I received them and asked Mr. Taylor, did you, in fact, write this check? And he advised, yes. And I said, did you, in fact, write Jewell Dowdell's name on here? And he said, yes. And I said to him, well, you knew at the time that this check was written that there was not funds in the account? And he acknowledged that. And we did that with all of the checks that I had."
 {¶ 33} Almost immediately after giving Husan, Musa and Bilal insufficiently funded checks, Taylor asked them to go to each bank and withdraw funds for his own benefit. Upon a review of this evidence in a light most favorable to the State, we conclude that it is sufficient to prove that Taylor knowingly deceived these banks by arranging deposits of checks drawn on an account with insufficient funds and shortly thereafter arranging the withdrawal of funds, of $5,000, from the accounts into which the checks were deposited, before the banks could become aware of the fact that the checks would bounce. State v. Ocain (June 12, 1998), Hamilton App. No. C-970273; State v. Odumoso (Sept. 13, 1989), Summit App. No. 13986.
 {¶ 34} After reviewing the record, we conclude that the trial court properly denied Taylor's motion for judgment of acquittal, and that sufficient evidence supports his convictions under R.C. 2913.02(A)(3). Taylor's reliance upon Baumgarden, supra, is misplaced. That case is factually distinguishable from the one before us because his actions in writing checks that later were returned did not create "an accounting and auditing trail that anyone might follow." State v. Faulkner (Aug. 20, 1990), Preble App. No. CA89-04-007. Unlike Baumgarden's employer, who simply could have looked at its own internal records, Midland, Key Bank, and Fifth Third Bank were at the mercy of a third party to alert them that the checks would be dishonored for insufficient funds.
 {¶ 35} Taylor's first assignment of error is overruled.
 III {¶ 36} Taylor's second assignment of error is as follows:
 {¶ 37} "THE JURY VERDICT, WITH RESPECT OF COUNTS 2, 3, 6, 7, 8, 9, 10 AND 11 WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 38} Taylor was convicted of Forgery and Uttering a check over $100,000. Counts 2 and 3. These charges related to the check that he wrote to Midland Title. He was also convicted of Forgery and Uttering checks over $5,000. Counts 6, 7, 8, 9, 10, and 11. These charges related to the checks used to initially fund the accounts at Key Bank and Fifth Third. Taylor contends that these charges are against the manifest weight of the evidence, because he had authority to sign Dowdell's name to the checks, so that he did not commit a Forgery and he did not Utter a written instrument that he knew to be forged.
 {¶ 39} To determine whether a conviction is against the manifest weight of the evidence:
 {¶ 40} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Thompkins, supra.
 {¶ 41} The weighing of evidence and credibility of witnesses, however, are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. Accordingly, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."Season Coal Co., Inc. v. Cleveland (1984), 10 Ohio St.3d 77,461 N.E.2d 1273 (internal citations omitted).
 {¶ 42} R.C. 2913.31, the Forgery statute, provides in relevant part:
 {¶ 43} "(A) No person, with purpose to defraud, or knowing that the person is facilitating a fraud, shall do any of the following:
 {¶ 44} "(1) Forge any writing of another without the other person's authority;
 {¶ 45} "* * *
 {¶ 46} "(3) Utter, or possess with purpose to utter, any writing that the person knows to have been forged."
 {¶ 47} In order to convict Taylor of Forgery and Uttering, the State was required to prove beyond a reasonable doubt that Taylor, with purpose to defraud, forged any writing of another without her authority and uttered any writing that he knew to have been forged. State v.Willis (June 29, 1995), Cuyahoga App. No. 67451. Taylor contends that he had Dowdell's permission to sign her name to the checks at issue. Because he had her authority to do so, he did not utter checks that he knew to have been forged.
 {¶ 48} We disagree. The evidence was sufficient to enable a reasonable juror to find that Taylor knew that the checks he signed Dowdell's name to and uttered were forgeries. The jury was entitled to believe, based upon Dowdell and Neely's testimony, that Taylor did not have Dowdell's permission to sign her name to a check that he knew would later be dishonored.
 {¶ 49} Although Dowdell testified that Taylor had authority, generally, to sign her name to checks drawn on the State Farm account. She also stated as follows:
 {¶ 50} "Q. Would you authorize Mr. Taylor to write checks for amounts of money that can't be cashed —
 {¶ 51} "* * *
 {¶ 52} "THE WITNESS [Dowdell]: No.
 {¶ 53} "Q. — if you knew about it?
 {¶ 54} "A. No.
 {¶ 55} "Q. Would you allow him to do that?
 {¶ 56} "A. No.
 {¶ 57} "Q. Did you authorize him to prepare, sign your name to checks for amounts of money that could be considered as a crime?
 {¶ 58} "A. No.
 {¶ 59} "Q. So all of those checks that we just went over that were not signed by you, you didn't authorize anybody, particularly Mr. Taylor, to sign that name and prepare the check for presenting to anyone?
 {¶ 60} "A. No."
 {¶ 61} A general authority to sign checks for another does not encompass the specific authority to sign another's name to a check when the actor knows that there is no chance that the check will be good, and the actor intends to defraud others in so doing. By analogy, when the owner of an automobile gives another authority, generally, to drive it, that does not ordinarily include the specific authority to deliberately run someone down with it. In the case before us, the jury could reasonably conclude that Dowdell did not intend, and no reasonable person would have understood her to have intended, by her general authorization to sign her name to checks, to have authorized Taylor to sign her name to checks totaling over $175,000 on an account in which there were insufficient funds to cover even the checks for $5,200 he wrote to Husan, Bilal and Musa, for the purpose of obtaining value for the worthless checks.
 {¶ 62} Moreover, even if the jury had completely disregarded Dowdell's testimony at trial, the jury could have concluded, based upon Neely's testimony, that Taylor admitted that he had no authority to sign Dowdell's name to the Midland Title check. Counts 2 and 3. Neely also testified that Dowdell told her that Taylor did not have authority to sign her name to the checks relating to Counts 6, 7, 8, 9, 10, 11:
 {¶ 63} "Q. * * * Immediately [after Taylor's arrest], within the next three weeks, four week [sic] weeks, I don't know, did you have any conversation with Jewell Dowell regarding her consent?
 {¶ 64} "A. Spoke to her multiple times, yes.
 {¶ 65} "Q. And as a result of your speaking to her, the case went to the grand jury?
 {¶ 66} "A. That's correct."
 {¶ 67} Taylor's subsequent action of arranging the withdrawal of $5,000 shortly after two forged checks were deposited at Fifth Third and Key Bank was further evidence of his intent to obtain money from the checks before they bounced. State v. Mitchell (Mar.20, 1984), Franklin App. No. 83AP-859.
 {¶ 68} Based upon the record before us, we cannot say that these convictions are against the manifest weight of the evidence. Accordingly, Taylor's second assignment of error is overruled.
 IV {¶ 69} Both of Taylor's assignments of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and WOLFF, JJ., concur.