120 Cal.Rptr.2d 831 (2002)
99 Cal.App.4th 138
The PEOPLE, Plaintiff and Respondent,
v.
Edaleene Sherrie SMITH et al., Defendants and Appellants.
No. B142943.
Court of Appeal, Second District, Division Seven.
June 10, 2002.
Rehearing Denied June 26, 2002.
Review Granted September 11, 2002.
*835 Phillip I. Bronson for Defendant and Appellant Smith.
Maxine Weksler, under appointment by the Court of Appeal, for Defendant and Appellant Thomas.
William Flenniken, Jr., under appointment by the Court of Appeal, San Francisco, for Defendant and Appellant Gonzalez.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Lance E. Winters, Supervising Deputy Attorney General, and Michael C. Keller, Deputy Attorney General, for Plaintiff and Respondent.
Certified for Partial Publication[*]
JOHNSON, J.
Defendants Smith, Thomas and Gonzalez were apprehended in a "sting" operation when they took 85 kilograms of cocaine planted by the police in a house the police controlled. Following a jury trial defendants were convicted of robbery, conspiracy to commit robbery, attempting to transport a controlled substance and grand theft. In addition to the punishment for these crimes, each defendant received a sentence enhancement for weapons use and a 25 year enhancement for attempting to transport more than 80 kilograms of cocaine. Unrelated murder charges against Thomas and Gonzalez were dismissed after the jury failed to reach a verdict on those counts. Defendants appeal their convictions and sentences. We affirm defendants' convictions but modify their quantity enhancements due to pre-arrest sentence manipulation by the police.

FACTS AND PROCEEDINGS BELOW
The police received information from a reliable informant defendant Smith was engaged in drug trafficking and home invasion robberies. Acting on this information an undercover police officer pretending to work for a major drug dealer met with Smith to find out whether she would be interested in stealing a shipment of cocaine from his "boss." Smith told the officer she was a professional and knew what she was doing. She said she always used the same crew, they had done this type of thing before and everything would be okay. Smith and the undercover officer agreed on how the cocaine would be split between them following the robbery. The officer told Smith he would be back in touch with her to discuss the details of the "rip off."
Based on Smith's willingness to commit the crime, the police proceeded to set up a sting operation. The officers involved in the sting obtained a court order releasing 85 kilograms of cocaine from a supply scheduled to be destroyed. They placed the cocaine in a van with an ignition kill switch. The officers then obtained the use of a vacant house and parked the van in *836 the garage, leaving the key in the ignition. In the kitchen the officers set up a table with a money counter, pay-and-owe sheets, rubber bands for wrapping money, and other paraphernalia associated with drug trafficking. Finally, the officers placed a key to the house under the front door mat.
When the scene had been set and a SWAT team in place, the undercover officer called Smith and gave her directions to the house where the cocaine was located. Smith, along with defendants Thomas and Gonzalez, drove to the house. When they arrived Smith remained in her car while Thomas and Gonzalez approached the house. Gonzalez removed the key from under the mat and unlocked the front door. Pulling a gun from his waistband, he and Thomas entered the unoccupied house. They walked through the kitchen into the garage. Gonzalez opened the garage door while Thomas got into the van. As Thomas backed the van out of the garage and down the driveway, an officer activated the kill switch and the van came to a stop. Police immediately surrounded Smith, Thomas and Gonzalez and took them into custody. Various firearms were recovered from the defendants.
A jury convicted Smith and Thomas of robbery, conspiracy to commit robbery, attempting to transport a controlled substance and grand theft. Smith received a sentence of 36 years in prison including a 25 year quantity enhancement under Health and Safety Code section 11370.4, subdivision (a)(6) because the cocaine she was convicted of attempting to transport weighed more than 80 kilograms. Thomas was given a prison sentence of 47 years, 8 months including the 25 year quantity enhancement Gonzalez was convicted of the same charges except conspiracy to commit robbery. He received a prison sentence of 33 years including the 25 year quantity enhancement. Unrelated murder charges against Thomas and Gonzalez were dismissed when the jury could not reach a verdict on these counts. Defendants filed timely appeals.[1]

DISCUSSION

I. SMITH AND THOMAS HAVE NOT SHOWN THEY WERE PREJUDICED BY THE DENIAL OF THEIR SEVERANCE MOTIONS.[**]

II. THE TRIAL COURT DID NOT HAVE A DUTY TO INSTRUCT SUA SPONTE THAT CONSENT IS A DEFENSE TO LARCENY.

Defendants were convicted of theft of the cocaine and of the van containing the cocaine. They argue these convictions must be reversed because the police consented to these takings hence there was no theft as a matter of law.[11] In the alternative, defendants argue the trial court erred in not instructing the jury sua sponte that consent is a defense to a charge of theft by larceny. We find neither argument persuasive.
The trial court instructed the jury on the crime of theft by larceny using CALJIC No. 14.02 which states in relevant part: "Every person who steals, takes, *837 carries, leads or drives away the personal property of another with the specific intent to deprive the owner permanently of the property is guilty of the crime of theft by larceny." We believe this instruction adequately conveys the concept the taking must be without the owner's consent and the trial court had no duty to instruct sua sponte on the consent element. Any person with even a modicum of exposure to western culture understands the essence of the crime of theft is the taking of another's property without consent.[12] No reasonable juror could interpret the instruction to mean, for example, a person can be convicted of theft who takes a piece of candy from a jar marked "freetake one" even though that person "takes ... the personal property of another with the specific intent to deprive the owner permanently" of the candy.
In any event, failure to instruct the jury on consent did not prejudice defendants. There can be no doubt the conduct of the police in actively inducing and assisting defendants to take the cocaine and the van constituted consent to the takings. The police conceived the plan to steal the cocaine, supplied the cocaine and the van, left the key to the van in the ignition, gave the defendants directions to the house and told them where to find the key and instructed defendants in virtually every move they made. The officers could not have done more to evidence their consent to the takings unless they personally delivered the cocaine and the van into the hands of defendants.[13]
As we discuss in Part III below, it is not the fact the police consented to a taking of their property that is important in this case. What is important is the nature of the consent.

III. THE GOVERNMENT'S CONSENT TO THE TAKING OF ITS PROPERTY DOES NOT REQUIRE REVERSAL OF THE DEFENDANTS' THEFT CONVICTIONS BECAUSE THE GOVERNMENT CONSENTED ONLY TO A TEMPORARY TAKING.

In this case the issue regarding consent is not factual but legal: what is the effect of the government's consent to the taking of its property on defendants' liability for theft? Does the government's consent provide defendants with a complete defense to the theft charges as they claim, or does it still leave them subject to conviction for attempted theft, or does it provide them no defense at all because the consent was to a "temporary" as opposed to a "permanent" deprivation of government property?[14]

A. The Theory Consent Is A Complete Defense.

Historically, active "sting" operations, such as the one carried out in the present case, have not fared well as a basis for convicting the "stingees" of theft or attempted theft.[15] Courts which have rejected *838 criminal liability in these cases have done so on the ground the property owner's consent negates the essential trespassory element of larceny.
A case often cited for this rule is Topolewski v. State.[16] In that case Dolan, a former employee of a meat packing plant, was approached by a defendant seeking Dolan's assistance in stealing meat from the plant. Dolan reported this meeting to Layer, a plant official, who told Dolan to continue his discussions with defendant and report back. Dolan and defendant agreed upon a scheme in which Dolan would arrange for four barrels of meat to be placed on the plant's loading platform and defendant would drive up and place the barrels in his wagon. Dolan reported this plan to Layer who directed the barrels of meat be placed on the platform the next morning and told the platform boss a man would be coming for them and to let them go. Defendant arrived as scheduled, loaded the barrels of meat into his wagon and drove off "with the intent to deprive the owner permanently thereof[.]"[17] Defendant was convicted of larceny. The Wisconsin Supreme Court reversed and ordered a new trial. The court reasoned "there can be no larceny without a trespass [so] if one procures his property to be taken by another intending to commit larceny, or delivers his property to such other, the latter purposing to commit such crime, the element of trespass is wanting and the crime not fully consummated however plain may be the guilty purpose of the one possessing himself of such property."[18]
In State v. Mehozonek[19] the management at a Ford auto parts plant learned from an employee, Fonseca, that security guards were allowing employees to steal parts and supplies from the plant. Ford management, in cooperation with the local police, set up a sting operation in which Fonseca would offer bribes to the guards to allow him to carry parts out of the plant. Four of the guards were arrested and convicted of grand theft after they assisted Fonseca in removing company property from the plant by advising him when and how to get the property out of the plant, when the gate would be unguarded and, in one case, actually helping Fonseca carry the items to his car.[20] Relying on Topolewski v. State[21] among other cases, the Ohio Court of Appeal reversed the guards' convictions for what it termed "mock crimes" and ordered a judgment of *839 acquittal.[22] The court found "the evidence clearly demonstrates that Fonseca [removed] automobile parts from the Ford plant with the prior knowledge and consent of the company."[23] The company's consent, the court held, was fatal to the convictions. "Where an owner of property seeks to apprehend and prosecute a would-be thief, the law is clear that the owner may do no more than inform the authorities and lay in wait for the suspect. If the owner originates the criminal plan, for the purpose of testing the trustworthiness of an employee, the courts uniformly hold that an owner by his or its conduct has consented to the taking, and that no crime has been committed."[24]
In another case testing employee honesty, People v. Frank,[25] the employer, a furrier, set up a plan in which one employee, Antonelli, would ask another employee, Frank, to "do him a favor" and take three pieces of fur belonging to the employer to a friend's store where Antonelli could pick them up that evening. Frank put the fur pieces under his topcoat but before he could leave the employer stopped him and the fur was discovered. The trial court dismissed the charge of petit theft against Frank.[26] "The difficulty in the prosecution of the present case," the court explained, "concerns the element of trespass, which is essential to the crime of larceny. ... [¶] The established line of cases upholds the proposition that the active participation of the owner in a scheme whereby his property is stolen nullifies this essential element of trespass in the crime of larceny."[27]
The California Supreme Court initially followed the Topolewski line of cases.[28] In People v. Werner,[29] the court reversed defendant's conviction for attempted theft by false pretenses on the ground that when the "victim" handed over his money to the defendant he was already aware of the defendant's scheme and had contacted the police. The victim, acting in concert with the police, voluntarily handed over his property to the defendant so the police could make an arrest. After discussing and quoting Topolewski, the court stated: "We are satisfied that there cannot be a theft or an attempted theft of a person's property when voluntarily and without compulsion of any sort, and uninfluenced by any false or fraudulent representations, he actively hands it over to the alleged thief for the purpose of apprehending him as a thief or as an attempted thiefhowever reprehensible the latter's intent may befor under such circumstances the essential element of lack of consent is missing."[30]

B. The Theory That Consent Is Not A Defense To Attempted Theft.

People v. Werner was overruled in People v. Camodeca "to the extent [it holds] that deception of the intended victim and *840 his reliance on the false representations are essential elements of the offense of attempted grand theft by false pretenses."[31] Writing for a unanimous court, Chief Justice Traynor affirmed Camodeca's conviction for attempted grand theft and rejected his argument his actions did not constitute an attempt to obtain money by false pretenses because his "victim" was not deceived and did not rely on his misrepresentations.[32] Justice Traynor acknowledged Werner supported Camodeca's argument but concluded the Werner court's reasoning was "unsound" because "[i]t failed to recognize the crucial distinction between the completed crime of [theft by] false pretenses and an attempt to commit such a crime." The justice explained: "One of the purposes of the criminal law is to protect society from those who intend to injure it. When it is established that the defendant intended to commit a specific crime and that in carrying out this intention he committed an act that caused harm or sufficient danger of harm, it is immaterial that for some collateral reason he could not complete the intended crime. Although the law does not impose punishment for guilty intent alone, it does impose punishment when guilty intent is coupled with action that would result in a crime but for the intervention of some fact or circumstance unknown to the defendant. [Citations.] In the present case there was not legal but only a factual impossibility of consummating the intended offense, i.e., the intended victim was not deceived."[33]
Applying the rationale of Camodeca to the case before us it is clear the defendants are guilty of at least attempted theft. It is indisputable they had the specific intent to permanently deprive the fictitious drug dealer of his cocaine and van and they took numerous direct and unequivocal acts toward that end.[34] It was only because, unbeknownst to defendants, the true owners of the drugs and the van had consented to their taking that the crime of theft by larceny was not consummated. But this factual impossibility does not exonerate defendants from liability for attempted theft.
It could be argued Camodeca is distinguishable from the present case because it dealt with theft by false pretenses, not theft by larceny as in our case, and it overruled Werner only insofar as Werner held "deception of the intended victim and his reliance on the false representations are essential elements of the offense of attempted grand theft by false pretenses."[35]Camodeca specifically did not overrule Werner insofar as it held "there cannot be a theft or an attempted theft of a person's property ... [when] the essential element of lack of consent is missing."[36]
We find this argument unpersuasive for several reasons.
Werner, it must be remembered, was not a theft by larceny case either but, like Camodeca, a case alleging theft by false pretenses. Thus, in a narrow sense, Werner *841 is no more authority for holding lack of consent is fatal to a conviction for attempted larceny than Camodeca is authority for holding it isn't.
Camodeca's significance is that it brought California into conformity with the great weight of authority in the United States and England which, in determining the defendant's guilt of an attempted crime, distinguished between the rare cases of legal impossibility and the common cases of factual impossibility.[37] Consistent with the weight of authority, Camodeca held factual impossibility did not exonerate the defendant from liability when the necessary mental state and a direct act were present.
Finally, punishing defendants for attempted theft under the circumstances of a case like the one before us is certainly more proportionate to their culpability than not punishing them at all. In carrying out their intent to rob a drug dealer defendants committed acts which, in Justice Traynor's words, gave rise to a "danger of harm."[38] The fact the defendants arrived at the scene heavily armed is one example of that danger.

C. The Theory Consent To A Temporary Taking Is Not A Defense To A Completed Robbery.

In our view, the question whether and to what extent the property owner's consent is a defense to a theft charge depends on the nature of the consent.
Under the nature-of-the-consent theory, as we conceive it, if the owner consents to a permanent deprivation of his property the consent is a complete defense to the charge of theft or attempted theft.[39] If, on the other hand, the owner only consents to a temporary deprivation of her property the consent is no defense to a completed or attempted theft.
Larceny, it will be recalled, is the taking of the property of another with the intent to deprive the owner permanently of her property.[40] Consent is a defense to larceny, not because it affects the taker's intent to permanently deprive the owner of her property, but because, conceptually, larceny requires the taking to be "trespassory," i.e., wrongful because it is without the owner's consent.[41] Thus, if the owner of property consents to the taker permanently depriving him of his property the taker is not guilty of larceny regardless of the intent she had when she took the property. But, if the owner of property only consents to the taker temporarily depriving him of his property the taker is guilty of larceny if she takes the property intending permanently to deprive the owner of the property. The taker is guilty of *842 larceny because the taking was trespassory, i.e., wrongful because it exceeded the owner's consent.
People v. Davis introduced the nature-of-the-consent theory in a larceny case which did not involve a sting operation but which illustrates how that approach affects liability for theft by larceny. Davis entered a Mervyn's department store, picked out a shirt and took it to the sales counter. He told the sales person he had purchased the shirt as a gift for his father but it didn't fit and he wanted to return it. A store security agent who had observed Davis's conduct instructed the sales person to give him the credit. Davis was arrested as he left the sales counter and convicted of petty theft.[42] Our Supreme Court affirmed the conviction, rejecting Davis's argument he was guilty at most of attempted petty theft.
Davis argued he was not guilty of theft of the shirt because he did not intend to permanently deprive the store of the shirt but only to possess it long enough to obtain a refund credit voucher. He further contended accepting the credit voucher lacked the element of trespass because the store, acting through its security agent, consented to the issuance of the voucher with full knowledge of how he came into possession of the shirt.[43] The Supreme Court disagreed with this analysis. "[T]he question is not whether Mervyn's consented to [the sales person's] issuance of the voucher after defendant asked to `return' the shirt; rather, the question is whether Mervyn's consented to defendant's taking the shirt in the first instance. As the Court of Appeal correctly reasoned, a self-service store like Mervyn's impliedly consents to a customer's picking up and handling an item displayed for sale and carrying it from the display area to the sales counter with the intent of purchasing it; the store manifestly does not consent, however, to a customer removing an item from a shelf or hanger if the customer's intent in taking possession of the item is to steal it."[44] Therefore, the court concluded, "[b]ecause Mervyn's cannot be deemed to have consented to defendant's taking possession of the shirt with the intent to steal it, defendant's conduct ... constituted a trespassory taking within the meaning of larceny."[45]
Davis was guilty of larceny because although Mervyn's consented to a temporary taking of the shirt for the time involved in carrying it to the sales counter and paying for it, Mervyn's did not consent to Davis stealing the shirt. Mervyn's consented to a temporary taking, not a permanent one.[46]
The nature-of-the-consent theory was applied to a government sting operation in United States v. Manarite[47] to uphold defendants' convictions for transportation and receipt of stolen property. In Manarite, an undercover FBI agent approached defendants with a burglary scheme. He claimed he laundered money for a drug dealer and that during his visits he and the dealer would invariably go out to lunch leaving the money unguarded on the dealer's boat. The agent assured defendants the boat would be unattended with the door unlocked so it would be easy to steal *843 the money. (Of course, the money and the boat belonged to the FBI and the drug dealer was fictitious.) Defendants agreed to steal the money. While two of the defendants maintained a lookout, the third boarded the boat and took the money. On appeal, defendants maintained their convictions for receiving and transporting stolen property could not stand because the money was not "stolen." The government implicitly consented to their taking the money through the undercover agent's aid and encouragement.[48]
The Court of Appeals framed the issue as "whether the government, by suggesting that its own property could be stolen and how the theft could be accomplished, has consented to the taking."[49] The court concluded defendants had committed a theft. It explained: "The Manarites seized the opportunity provided them by an undercover agent to commit a burglary, stealing government property in the process. It is true that the government tempted the Manarites with the prospect of gain from theft. But the FBI agent did not give them permission to take property from the `drug dealer's' boat or suggest that the drug dealer would permit it."[50]
Similarly, in the sting operation here the police consented to the defendants taking the cocaine and the van but only for so long as it took them to back the van part way down the driveway. The police never consented to being permanently deprived of their property. Because, as in Davis and Manarite, the police officers' consent and the defendants' intent did not match, the defendants' taking in this case was trespassory and defendants are guilty of a completed theft.
We recognize there are arguments against adopting the nature-of-the-consent approach to liability for theft by larceny but we find these arguments unconvincing for the reasons explained below. As we also explain below, we find persuasive public policy reasons for adopting this approach.
One objection to looking to the nature of the victim's consent instead of the fact of consent itself is that the Supreme Court, in People v. Camodeca, held consent to a taking, when the other elements of theft are present, results in an attempted theft.[51] The court did not base its decision on the "nature" of the victim's consent. Under the nature-of-the-consent test, virtually all cases, certainly all active sting cases, will result in liability for a completed theft in contravention of Camodeca.[52] A closely related argument is that even if Camodeca could be distinguished from the present case, the nature-of-the-consent theory results in punishing those involved in theft by larceny more severely than those involved in theft by false pretenses.[53]
We do not believe Camodeca precludes a court from looking at the nature of the victim's consent in a theft case where consent is an issue. Initially, we note Camodeca *844 did not hold a theft which would have been complete except for the victim's consent to the taking is only punishable as an attempted theft. The court in Camodeca was presented with a case in which the defendant was convicted of attempted theft. Therefore, the issue before the court was not whether the defendant should have been convicted of a completed theft but whether the theft charge should have been dismissed altogether under the holding in People v. Werner.[54] The court concluded Werner was wrongly decided and affirmed the defendant's conviction for attempted theft.[55] The high court did not again address the consent defense to theft until its decision in People v. Davis in which it rejected the defendant's contention he should have been found guilty only of attempted theft, if guilty at all. In Davis, the court affirmed the defendant's conviction for a completed theft applying what was in essence the nature-of-the-consent test we adopt here.[56] In light of the Supreme Court's decision in Davis we do not believe Camodeca is good authority, if it ever was, for the proposition a theft which would have been complete except for the victim's consent to the taking is never more than an attempted theft.
As to the argument the nature-of-the-consent test will result in more serious punishment for those involved in theft by larceny than those involved in theft by false pretenses, we do not agree this is the case. This argument assumes those who are involved in theft by false pretenses where the victim is not deceived are, under Camodeca, liable at most for attempted theft whereas those involved in theft by larceny are under our holding, liable for completed theft. However, as we pointed out above, Camodeca does not compel this result. Indeed, we see no reason why the nature-of-the-consent test should not apply to both crimes. Theft by larceny and theft by false pretenses both involve the permanent deprivation of property without the owner's consent. In the former, the owner's consent is not sought; in the latter the owner's consent is obtained through fraud.[57] Like the property owner in the case of larceny, the property owner who is not deceived by the defendant's false representations could nevertheless consent to a temporary taking of his property, just long enough for the police to make an arrest.
Rather than creating a discrepancy in punishment between cases involving larceny and false pretenses, the nature-of-the-consent test would eliminate a discrepancy in punishment between those apprehended in a "passive" sting and those apprehended in an "active" sting.
As noted above,[58] a passive sting usually involves a decoy operation in which the police merely create the opportunity to commit a crime and wait to see who takes that opportunity. The classic example of a passive sting is described in People v. Hanselman.[59] On the night of the alleged crime, a constable by the name of Slanker disguised himself and pretended to be drunk. "After staggering around the streets a while, he lay down in an alley and *845 pretended to be in a drunken stupor. Shortly afterward, the appellant and another person came to him and took from his person three dollars, which he had put in the pocket of his overalls. He was perfectly conscious at the time and made no resistance, and intended that any thief who tried it should be allowed to take the three dollars in order that a case of larceny might be made out against him. He had no previous suspicion, however, of the appellant, and was surprised at his participation in the act. And under these circumstances counsel for appellant contends that the thing done was not a larceny, because the money was not taken against the consent of the prosecuting witness."[60] The Supreme Court rebuffed this argument. The court conceded that "as a general proposition, ... larceny is not committed when the property is taken with the consent of the owner[.]" But, the court stated, "we do not think that there is such consent where there is mere passive submission on the part of the owner of the goods taken, and no indication that he wishes them taken, and no knowledge by the taker that the owner wishes them taken, and no mutual understanding between the two, and no active measure of inducement employed for the purpose of leading into temptation, and no preconcert whatever between the thief and the owner."[61] The court concluded: "[W]e are of the opinion that the conduct of the witness Slanker, as detailed by him in his testimony, did not amount to consent in law, and affords no reason why the act of appellant in taking the money ... was not larceny."[62]
No valid reason appears why an "opportunistic thief"[63] like Hanselman should be punished more severely than a thief like Smith who commits her larceny after long and involved planning and preparation. Yet, such would be the result if the victim's consent, regardless of the reason for it, limits the defendant's liability to attempted theft.[64]
For the reasons set forth above, we conclude the defendants in this case were properly convicted of theft.

IV. SUBSTANTIAL EVIDENCE SUPPORTS THE ENHANCEMENT FOR FIREARM USE.[***]

V. DEFENDANTS DID NOT ESTABLISH ENTRAPMENT AS A MATTER OF LAW.

Defendants maintain their convictions on all counts should be reversed because, the jury's verdict notwithstanding, *846 they established entrapment as a matter of law. We disagree.[72]
The leading California case on the entrapment defense is People v. Barraza.[73] In that case our Supreme Court held "the proper test of entrapment in California is the following: was the conduct of the law enforcement agent likely to induce a normally law-abiding person to commit the offense?"[74] In formulating this test the court specifically rejected a factual inquiry into who initiated the crimethe defendant or the police. "[W]e are not concerned with who first conceived ... a criminal project. What we do care about is how much and what manner of persuasion, pressure, and cajoling are brought to bear by law enforcement officials to induce persons to commit crimes."[75] Under this test, "such matters as the character of the suspect, his predisposition to commit the offense, and his subjective intent are irrelevant."[76] Instead, entrapment is established by showing either (1) the police "generate[d] in a normally law-abiding person a motive for the crime other than ordinary criminal intent" such as an appeal to "friendship or sympathy" or (2) the police made commission of the crime "unusually attractive to a normally law-abiding person" by offering "exorbitant consideration, or any similar enticement."[77]
Defendants argue the evidence established entrapment as a matter of law because the cocaine robbery was written, produced and directed by officers Martinez and Alvarez who conceived the plan to steal the cocaine, scripted Martinez's conversations with defendants, supplied the cocaine, the van and the "stash house," furnished the house with the appropriate drug paraphernalia, told defendants where the key to the house was hidden, left the key to the van in the ignition, gave the defendants directions to the house when they got lost and instructed defendants on their every move in committing the crimes.
We reject defendants' argument. As noted above, the fact the police went to defendants with the proposal to steal a shipment of cocaine is irrelevant to the defense of entrapment.[78] What is relevant is the absence of any evidence of persuasion, pressure, badgering, cajoling or importuning on the part of the police to induce defendants to accomplish the proposed crimes.[79] On the contrary, the evidence shows Smith eagerly agreed to assist Martinez when he proposed stealing a shipment of cocaine from his "boss." Sandoval, the police informant, testified when he first mentioned the plan to Smith "she got very excited" and made statements to convince Sandoval she could handle the job saying everything would work out well, she was an honest person and everyone would get their cut, she and her crew were "professionals" and knew "how to handle that kind of work." Smith readily agreed to *847 meet with Martinez at a neutral location and gave Sandoval her pager number so he could contact her to arrange the meeting.
Defendants further contend the police made the crime appear unusually attractive to a law abiding person by having Martinez tell Smith there would be somewhere between 30 and 100 kilos at an unguarded house, he would be present at the house to admit her and her crew and all they had to do was walk in, pick up the drugs and drive off. Martinez also agreed to Smith's proposal for dividing up the stolen cocaine. If there was 30 kilos she would take five and her crew would get three each. If there was more than 30 kilos she would take 40 percent for her and her crew. Martinez testified a kilo sold for between $17,000 and $30,000 wholesale so Smith and her five man crew would walk away with between $340,000 and $1,200,000 worth of cocaine.
This argument suffers from two fatal flaws. First, to find a law-abiding citizen would be enticed by the financial gain from this crime one has to assume a law-abiding citizen would know the wholesale value of a kilo of pure cocaine and, second, that a law-abiding citizen would know how to broker between 30 and 100 such kilos. We have no basis for making either assumption.
Furthermore, the fact the police make a crime look easy to commit does not constitute entrapment as a matter of law. As our Supreme Court observed in People v. Watson, "a person who steals when given the opportunity is an opportunistic thief, not a normally law-abiding person."[80] In any event, the evidence showed Smith was not convinced the theft would be as easy as Martinez represented. Smith told Martinez her crew would be armed in case the occupants of the residence where the cocaine was located came out shooting.
We conclude the evidence provided the jury reasonable grounds to reject defendants' entrapment defense. The police may have written, produced and directed this drama but defendants chose to act in it.

VI. THE EVIDENCE DOES NOT SUPPORT DEFENDANTS' CLAIM OF OUTRAGEOUS POLICE CONDUCT.

In People v. Wesley, we impliedly recognized there can be situations in which the government's conduct in investigating, arresting or prosecuting a defendant is so outrageous a conviction would deny the defendant due process of law.[81] In the present case, defendants contend the activities by the police in creating the cocaine robbery were so outrageous the trial court should have dismissed all charges stemming from that crime or, at the very least, instructed the jury sua sponte on the defense of outrageous police conduct. Neither contention has merit.
Wesley identified four factors a court should consider in determining whether due process principles had been violated by outrageous police conduct: "`(1) whether the police manufactured a crime which otherwise would not likely have occurred, or merely involved themselves in an ongoing criminal activity [citations]; (2) whether the police themselves *848 engaged in criminal or improper conduct repugnant to a sense of justice [citations]; (3) whether the defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness [citation]; and (4) whether the record reveals simply a desire to obtain a conviction with no reading that the police motive is to prevent further crime or protect the populace.'"[82] We went on to say these factors are only illustrative and no one is, in itself, determinative. Each factor should be viewed in context with all pertinent aspects of the case and proper law enforcement objectives.[83]
Defendants argue the police engaged in outrageous conduct for the following reasons. In approaching Smith with a proposal to commit a cocaine robbery the police relied entirely on the word of a paid informant with a felony record. The police made no attempt to verify the informant's claim Smith had committed similar crimes in the past nor did they attempt to determine if Smith had any prior convictions or even arrests for robbery or drug trafficking. The police created, controlled and choreographed the criminal activity from start to finish. It was the police who approached Smith with the proposal to commit the crime and it was the police who supplied the cocaine, the "stash house," and the get-away vehicle. The police also kept in constant communication with Smith telling her when the drugs had arrived at the house, where the house key was hidden, giving her directions how to get there and advising her when it would be safe to go. Finally, it was the police who decided to place 85 kilos of cocaine in the house, an amount which would trigger the maximum sentence enhancement if defendants were convicted of transporting the drug.
We are not persuaded the actions by the police, individually or taken as a whole, amounted to "outrageous conduct" or that a reasonable jury could have so found. None of the factors we identified in Wesley are present here.
While it is true the police approached Smith and not vice versa they did not do so on a whim or out of personal malice. Rather, the police acted on information from a dependable informant Smith was engaged in drug trafficking and home invasion robberies. The informant, Sandoval, had established his reliability with the federal Drug Enforcement Agency by providing its agents with information for the past 13 years. Sandoval had also worked with Detective Alvarez of the Los Angeles Police Department who orchestrated the sting operation in this case. Furthermore, before the police initiated the sting Sandoval had two conversations with Smith in which she confided to him "she had some people that will do some rip-offs." Sandoval asked Smith "if she would be interested in doing one." Smith affirmed her interest, telling Sandoval she and her crew were "professionals" and "[knew] how to handle that kind of work" because she had been doing these robberies "10 years and ... never even been caught." Our review of the record shows Smith never expressed any reluctance to steal the cocaine nor did Sandoval or the police exert any pressure on her to do so. On the contrary, just prior to executing the robbery Smith told Detective Martinez, the undercover officer *849 directing the crime, to "continue with the plan" and "don't back off." Smith repeatedly emphasized to Sandoval and Martinez they had nothing to worry about because she and her crew knew what they were doing, nobody would get hurt and everyone would get their cut.
After hearing Sandoval's reports of his conversations with Smith and listening to a secret recording of one of their meetings the police designed an operation in which an undercover officer was introduced to Smith by Sandoval. The undercover officer, Martinez, told Smith he wanted her help to "rip off a big-time drug dealer. When Smith agreed to do the job, the police proceeded to arrange the sting. We see nothing shocking or offensive about the police conduct. "`[R]uses, stings, and decoys are permissible stratagems in the enforcement of criminal law[.]'"[84] In People v. Peppars, the court held the police did not engage in outrageous conduct by assisting the defendant to plan a warehouse burglary and stocking the warehouse with televisions and stereos.[85] In the present case the police did not manufacture a crime which otherwise would not have occurred but involved themselves in Smith's criminal activity which, by her own admission, she had been pursuing for the past 10 years.
The record does not show the police in this case were motivated simply by a desire to obtain a conviction but rather demonstrates they were motivated by a desire to stop a robbery ring which had operated undetected for the past decade and to protect the public from the violence which could easily result when a gang of thieves attempts to steal pure cocaine from a drug lord.
The remaining issue is whether the police engaged in improper conduct by planting 85 kilos of cocaine when they could have made the sting work with less than half that amount. We believe this issue goes to the propriety of defendants' sentences, not to the constitutionality of their prosecution. See discussion in Part X, below.

VII. EVEN IF THE PROSECUTOR MADE AN IMPROPER ARGUMENT TO THE JURY AND THE ERROR NOT WAIVED, SMITH WAS NOT PREJUDICED THEREBY.

During his closing argument, the prosecutor pointed out numerous weapons were recovered from defendants following the cocaine theft but the weapon used in the unrelated murder was not among them.[86] The prosecutor suggested the reason why the murder weapon was not recovered in the sting operation was because "Sherrie Smith, professional as she is, is [not] going to let her crew drive across Los Angeles with a gun that can tie Mr. Thomas or Mr. Gonzalez to the murder[.]" Smith made no objection to the prosecutor's remark at the time it was made. Later, she moved for a mistrial on the ground the prosecutor argued a fact not in evidence, that Smith had knowledge of the murder weapon, and the remark was prejudicial to Smith's entrapment defense in the cocaine theft because it tied her to the murder even though she was not charged with any involvement in that crime.
The belated motion for mistrial did not preserve the error for appeal. If *850 an objection to alleged prosecutorial misconduct is not lodged at the time the misconduct occurs and an admonishment requested, the error is waived.[87] An exception to this rule arises only if an admonishment would not have cured the harm caused by the misconduct.[88]
In the present case, Smith's failure to timely object to the prosecutor's remark and request the court to admonish the jury precludes her claim of misconduct on appeal. This is the kind of matter which easily could have been cured by an admonishing the jury it was not to consider evidence related to the murder charge against Thomas and Gonzalez in determining Smith's guilt or innocence on the charges stemming from the cocaine theft.
Furthermore, even if the objection to the prosecutor's remark had not been waived, the remark was not prejudicial. Given the state of the evidence on the entrapment defense,[89] it is not reasonably probable the jury would have reached a result more favorable to Smith in the absence of the prosecutor's remark.[90]

VIII. THE TRIAL COURT PROPERLY INSTRUCTED THE JURORS THAT IN ARRIVING AT THE VERDICTS THEY SHOULD AVOID DISCUSSING OR CONSIDERING THE DEFENDANTS' PUNISHMENT

The trial court gave the jury the standard instruction under CALJIC No. 17.42 not to discuss or consider the subject of penalty or punishment in arriving at the verdicts. Defendants claim this instruction deprives them of their constitutional right to a jury trial because the jury was not permitted to fulfill its role as the conscience of the community, i.e., to engage in jury nullification.
Our Supreme Court has approved CALJIC No. 17.42 and, indeed, has held it is error not to give that instruction.[91] Until the high court changes its view, we are bound to follow its ruling.[92]

IX. DEFENDANTS WERE NOT PREJUDICED BY THE TRIAL COURT'S "ANTI-NULLIFICATION" INSTRUCTION.

The trial court instructed the jurors under CALJIC No. 17.41.1 "the integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions" and they should report to the court any juror who expresses an intent to disregard the law.
This instruction, defendants maintain, deprived them of their Sixth and Fourteenth Amendment rights to a unanimous jury verdict and constituted an unwarranted interference with the jury's historic right of nullification.
Even if the trial court erred in giving this instruction,[93] in the present *851 case there was no jury deadlock, no hold-out juror and no reports of any juror refusing to follow the law. In short, there was no indication the use of this instruction affected the verdict in any way.

X. PRE-ARREST SENTENCE MANIPULATION DENIED DEFENDANTS DUE PROCESS OF LAW AND REQUIRES MODIFICATION OF THEIR SENTENCES.

Because defendants attempted to transport more than 80 kilograms of cocaine they each received the maximum, 25 year, sentence enhancement under Health and Safety Code section 11370.4, subdivision (a)(6). Defendants moved to strike this enhancement under subdivision (e) of the statute[94] on the ground the police deliberately used 85 kilograms of cocaine in the sting so defendants would receive the maximum punishment if convicted even though the police knew defendants would have agreed to the operation if it only involved 30 kilograms. The trial court rejected the motions to strike the enhancements on the ground "defendants at all times had a chance or ability to say, no, I don't want this; I have no interest in this; I don't want to go through with this." Rather than backing out, the court observed, "if anything, the amount of cocaine whet their appetite ...."
We hold that where the police have discretion in the amount of drugs to use in a sting operation and select an amount for no other reason than to maximize the defendant's sentence the police have acted in a manner so fundamentally unfair as to deny the defendant due process of law.
Most federal courts[95] and several states[96] have recognized pre-arrest sentence manipulation by the police may be a ground for reducing the defendant's sentence. By "sentence manipulation" we mean conduct engaged in by law enforcement for the sole purpose of increasing the defendant's sentence.[97] There are a number of reasons why law enforcement *852 agents should not be allowed to structure their operations in such a way.
Putting sentencing decisions effectively in the hands of the police undermines the purpose of the Determinate Sentencing Law (DSL) to eliminate disparity and impose uniformity in sentencing. In enacting the DSL the Legislature declared "the elimination of disparity and the provision of uniformity of sentences can best be achieved by determinate sentences fixed by statute in proportion to the seriousness of the offense as determined by the Legislature to be imposed by the trial court with specified discretion."[98] Uniformity is impossible and disparity guaranteed if sentencing decisions are delegated all the way down to the individual police officer operating in the field. If law enforcement can, without restraint, choose the amount of drugs to be bought, sold, manufactured or stolen then the amount chosen by law enforcement determines the sentence; legislative sentencing choices and trial court discretion are effectively cut out of the system.[99]
Our concern over the increase in disparity and the decline in uniformity is not the result of some "fastidious squeamishness ... about combating crime too energetically" or some "private sentimentalism" toward the DSL.[100] Rather, it arises from our concern the constitutionally fundamental separation of powers[101] be maintained between the executive (law enforcement), legislative and judicial branches and in particular that judicial sentencing discretion be governed by the law of society and not what an individual police officer views as the "law of the street."[102] As our Supreme Court reiterated in Manduley v. Superior Court:[103] "[T]he power to define crimes and fix penalties is vested exclusively in the legislative branch.... When the decision to prosecute has been made, the process which leads to acquittal or to sentencing is fundamentally judicial in nature." The separation of powers doctrine, of course, is intended to serve an even more fundamental constitutional principle: that each branch of government be subject to a system of "checks and balances" so no branch attains arbitrary or inordinate power over any other.[104] It is not "judicial activism" to reign in otherwise unchecked police discretion which threatens to usurp the sentencing function conferred on the judiciary by the Legislature.
*853 Finally, it must be borne in mind "[t]he touchstone of due process is protection of the individual against the arbitrary action of government."[105] When the police can determine the defendant's sentence by deciding, for example, the quantity of drugs to "put in play," equally culpable defendants will invariably receive unequal sentences and unequally culpable defendants will receive equal sentences depending on such factors as which law enforcement agency sets up the sting, whether the officer in charge of the sting decides to give the defendant a break or "throw the book at him," and the quantity of drugs available to the officer to set up the sting.[106]
Courts which have recognized pre-arrest sentence manipulation by the police may be a ground for reducing the defendant's sentence have differed over what the defendant must show to establish impermissible manipulation. Some courts have required a showing the police engaged in "outrageous conduct."[107] Some have required a showing of "extraordinary conduct" or "something less."[108] Some have required only a showing the police conduct was "for the sole purpose of ratcheting up a sentence]"[109]
We do not believe a showing of "outrageous" conduct is required in order to establish sentence manipulation. As discussed in Part VI, above, outrageous police conduct is a complete defense to the prosecution. Thus, in cases where outrageous conduct has occurred there would be no need to reach the issue of sentencing.[110] Furthermore, we surely need not wait until we find the sentence-manipulation equivalent of forced stomach pumping before we declare a violation of due process has occurred.[111] Rather, we believe defendants establish sentence manipulation for purposes of the quantity enhancement when they show the police selected the amount of drugs for no legitimate law enforcement purpose but solely to maximize the defendants' sentence. The no-legitimate-purpose standard prevents sentence manipulation for the sole reason of enhancing punishment but does not interfere with legitimate undercover operations. Moreover, this test does not excuse defendants for the harm they caused during the part of the sting operation not designed to maximize her sentence.[112]
*854 We turn now to the question whether defendants established sentence manipulation in this case.
Initially, we note the defendants attempted to put on evidence at trial showing Alvarez was aware that by placing 85 kilos of cocaine in the van to be stolen the defendants would, if convicted of attempted transportation, be subject to the maximum enhancement of 25 years. The trial court properly excluded this evidence because it was not relevant to defendants' guilt or innocence but related only to their sentences should they be convicted.[113] Defendants did not attempt to call Alvarez as a witness at the sentencing hearing.
We do not believe this lack of direct evidence about the officers' knowledge of the quantity enhancements is fatal to defendants' showing of sentence manipulation. No judicial officer would be so credulous as to believe Alvarez and Martinez did not know the penalties for drug transportation. Alvarez had been a police officer for 27 years and assigned to narcotics for 22 of those years. For the ten years prior to his retirement he was a detective supervisor assigned to the major violator section of the narcotics division. He testified he had conducted in excess of a thousand narcotics investigations and arrested thousands of suspects for narcotics violations. Martinez worked as an undercover officer for nine years investigating "major narcotic traffickers."
Furthermore, as we next discuss, the evidence which was produced at trial showed no legitimate law enforcement purpose behind the use of 85 kilos in this sting operation. The only reasonable conclusion is that the police selected the amount of drugs solely for the purpose of increasing the defendants' sentence enhancements to the maximum.
The evidence in this case shows the idea of staging a home invasion robbery to steal cocaine was first suggested to Smith by Sandoval, the police informant. Sandoval testified Smith got "very excited" when he told her there would be approximately 200 kilos of cocaine in the house. However, the first time undercover officer Martinez met with Smith and Thomas to discuss the theft he told them the amount of cocaine would be anywhere from 30 to 100 kilos. Smith made it clear to Martinez she and her crew would do the theft for 30 kilos. Martinez testified as follows:
"Q. Who came up with what the fee would be?
"A. Defendant Smith did.
"Q. What did she tell you she would want in exchange for providing you the services that she offered?
"A. She specifically said if there was 30 kilos of cocaine, she would need three kilos per each one of her boys going to the residence and five kilos for her, and then the rest would be mine."
This evidence shows Alvarez was aware Smith would do the theft if the take was 30 kilos. He testified, "when [we] met with defendant Smith and defendant Thomas, we started talking about 30 kilos, is what we told them." Neither Smith nor Thomas balked at doing the job for 30 kilos. It was not until the defendants' final meeting with Martinez that he told them there would be 85 kilos in the house.
Not only does the evidence show defendants were willing to proceed if only 30 kilos were involved, it also shows Alvarez had a 30 kilo batch of cocaine available from a previous case and that he used that 30 kilo batch plus another 55 kilo batch to make up the total 85 kilos he used in the sting against defendants.
*855 We believe this evidence compels a finding of sentence manipulation. At the time Alvarez and Martinez were setting up the house and the van for the sting they knew defendants had committed to carrying out the theft in the belief there would be at least 30 kilos of cocaine involved. Smith and Martinez had even agreed to the split assuming the theft netted 30 kilos. Alvarez had a 30 kilo batch of cocaine available to him in the police property room. But, instead of placing the 30 kilos in the van to be stolen, Alvarez went out of his way to obtain a second, 55 kilo batch, and placed it in the van as well thereby triggering the maximum sentence enhancement of 25 years for 85 kilos instead of the 15 year enhancement for 30 kilos.[114]
The People do not dispute these facts. They do, however, dispute our conclusion sentence manipulation should be recognized as a factor affecting sentencing in California and our conclusion sentence manipulation occurred in this case.
Initially, the People contend there is no need to adopt a "sentence manipulation" exception to the quantity enhancements in section 11370.4 because, unlike the federal sentencing guidelines, section 11370.4 already contains a brake on overzealous police conduct by authorizing the trial court to strike the enhancement based on mitigating circumstances.[115] Additionally, the statute provides the enhancement does not apply in the case of a defendant whose liability is based on a conspiracy to violate one of the triggering statutes unless the trial court finds the conspirator was "substantially involved" in the planning or execution of the crime.[116]
The distinction the People seek to draw between the federal sentencing guidelines and section 11370.4 is valid so far as it goes but there is no statute, court rule or appellate opinion defining a "mitigating circumstance" for purposes of section 11370.4.[117] Thus, for the guidance of the trial courts, there would still be a need to specify that sentence manipulation is a factor affecting the enhancement of the defendant's sentence.[118]
The People also argue even if sentence manipulation should be recognized in theory there was no sentence manipulation, as we have defined it, in this case.
There was a legitimate law enforcement purpose for using 85 kilos in this case, the People contend. The reason for using 85 kilos was, as Alvarez explained, a professional "rip-off crew" like defendants would not be enticed by a few measly kilos; the police needed to dangle a big score in front of them to whet their appetite for the venture. "When we set them up," Alvarez testified, "we don't say to a crew like that that we want to go someplace, that we have information having to do with three kilos of cocaine or five kilos of cocaine, because it wouldn't be worthwhile for a crew to do that." Accordingly, the police talked to Smith in terms of a scheme involving hundreds of kilos. Martinez could hardly go to Smith with a deal involving 10 or 20 kilos and then, if she rejected the deal as too small-time, come back and say the amount was 100 or 200 *856 kilos. Smith would immediately recognize the proposed deal as a sting, Martinez's cover would be blown, and he could suffer physical harm or even death.
The People's argument fails because the evidence in this case shows the police did not need to guess at the amount which would attract Smith and her gang to the venture and therefore needed to guess high. Martinez established at his first meeting with Smith and Thomas they would do the theft if it involved 30 kilos. There was no need to ratchet up the amount of cocaine involved in the operation except to insure the most severe punishment for the defendants.[119]
Another reason why no sentence entrapment occurred here, the People say, is because defendants were told at the final meeting preceding the operation the cocaine involved would be 85 kilos. Knowing the amount of cocaine they would be stealing, and presumably knowing the sentencing consequences if they were caught and convicted, defendants went ahead with the operation when they could have called it off.[120] As the trial court put it, referring to defendant Smith, "She could at any time have said, no, I don't want to do this."
There are two defects in the "just-say-no" argument, both related to its failure to apprehend or address the fundamental concept underlying sentence manipulation. Except in rare cases involving actual duress, the "just-say-no" response would counter to any affirmative defense or plea of mitigating circumstances. More importantly, the "just-say-no" response misunderstands the thrust of the sentence manipulation claim which focuses not on the offender's conduct but on the government's.[121] The relevant question to ask is not whether defendant was "in for a dime, in for a dollar," but whether, if being in for a dime is sufficient to satisfy the government's legitimate law enforcement purposes, there is any rational reason to cause the defendant to be in for a dollar.
Before leaving the People's side of the case, a brief discussion of United States v. Sanchez is in order since its facts bear a resemblance to those in the case before us. In Sanchez, the Bureau of Alcohol, Tobacco and Firearms (AFT) received information from a confidential informant about a group of armed home invaders who would "rip-off narcotics from stash houses. Working with the informant, the ATF created a sting operation in which the defendants agreed to invade a stash house to steal drugs they were informed would consist of 50 kilos of cocaine and 300 pounds of marijuana. Defendants were arrested in a parking lot where they had assembled in preparation for the operation.[122] On appeal from their convictions for conspiracy to possess with intent to distribute cocaine and marijuana the Eleventh Circuit brushed aside defendants' claim of sentence entrapment saying: "The fact that the government's fictitious reverse sting operation involved a large quantity of drugs does not amount to the type of manipulative governmental conduct warranting a downward departure in sentencing."[123]
*857 Clearly, Sanchez reached the right result. The fact a sting operation involved a large quantity of drugs enough, for example, to trigger the maximum sentence enhancementis not sufficient to establish sentence manipulation. There are many legitimate reasons why law enforcement might need to use a large amount of drugs in a sting operation: to entice the suspects into the sting, as discussed above; to build up over time the suspect's confidence in an undercover agent or informant; or to carry the sting on long enough to trace the supply to the drug "king pin," to name a few. What was missing in Sanchez, as opposed to the case before us, was any evidence suggesting the officers involved in the case lacked a bona fide reason for choosing the amount of drugs on which to base the sting. We emphasize sentence manipulation can only occur when there is no legitimate law enforcement purpose for the police conduct and its only purpose is to increase the severity of the defendant's sentence. The defendant bears the burden of proof on this issue.[124]
In the present case, no legitimate law enforcement objectives were served by using 85 kilos of cocaine in the sting operation when the uncontradicted evidence shows 30 kilos would have worked just as well. The only objective we can discern from the evidence was to put the defendants in jail and throw away the "ki."[125]
Finally, having concluded the officers in this case engaged in sentence manipulation in violation of defendants' due process rights, we address the question of remedy. We see only two choices: remand the matter to the trial court to reconsider the motion to strike, taking into account the sentence manipulation as a mitigating factor; or modify the sentence ourselves to reflect a quantity enhancement based on 30 kilos of cocaine instead of 85.
We reject the first alternativeto treat sentence manipulation as a mitigating factorbecause a due process violation is more than a "mitigating factor." A sentence which violates the defendant's right to due process cannot stand.
The proper remedy is to modify the sentence to reflect a quantity enhancement based on 30 kilos of cocaine instead of 85. Such a remedy, we believe, serves as a future disincentive for the police to unnecessarily ratchet up the severity of the crime while at the same time punishing the defendants in the present case in accordance with their culpability. We recognize there are numerous cases, including one from this division, holding a trial court has no power under Health and Safety Code section 11370.4, subdivision (e) to "strike" the enhancement for one quantity level and impose the enhancement for a lower quantity level.[126] These decisions are inapposite because we are not striking defendants' sentence enhancements under section 11370.4, subdivision (e). Rather, we are exercising our inherent power to fashion a remedy for a constitutional violation which does no more and no less than correct that particular violation.[127]

DISPOSITION
Defendants' judgments of convictions are affirmed. Each defendant's sentence *858 is modified by reducing the sentence enhancement under Health and Safety Code section 11370.4, subdivision (a) from 25 years to 15 years. The trial court is directed to prepare a modified abstract of judgment and to send a copy of the corrected judgment to the Department of Corrections. In all other respects the sentences are affirmed.
We concur: LILLIE, P.J., and WOODS, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I and IV.
[1] We ordered Gonzalez's appeal consolidated with those of Smith and Thomas. For purposes of the three appeals we will assume each appellant intends to incorporate the others' arguments to the extent they are applicable.
[**] See footnote *, ante.
[11] Lack of consent is essential to a conviction for theft by larceny. People v. Werner (1940) 16 Cal.2d 216, 224, 105 P.2d 927, overruled on another ground in People v. Camodeca (1959) 52 Cal.2d 142, 147, 338 P.2d 903; People v. Davis (1998) 19 Cal.4th 301, 305, 79 Cal.Rptr.2d 295, 965 P.2d 1165.
[12] Even so, defendants could have requested an instruction on consent under CALJIC No. 1.23 but did not do so. The element of consent was not totally ignored, however. Smith argued lack of consent to the jury but the jury did not accept this argument.
[13] Cf. People v. Werner, 16 Cal.2d at page 223, 105 P.2d 927.
[14] We discuss separately the question whether defendants established the defense of entrapment. See Part V, infra.
[15] "Active sting operations" are those in which the police play an orchestrating role in the sting such as by taking on the role of victim or fellow criminal, setting up the time, place and manner of the sting, supplying the props and the booty. They are generally aimed at a specific suspect. See, e.g., State v. Mehozonek (1983) 8 Ohio App.3d 271, 456 N.E.2d 1353, discussed below. "Passive sting operations" are those in which the police use a decoy or bait and simply wait for a criminally-disposed person to act. They are generally not aimed at a specific suspect. See e.g., People v. Watson (2000) 22 Cal.4th 220, 222, 91 Cal.Rptr.2d 822, 990 P.2d 1031. Courts in these kinds of cases usually find there is no issue of the government's consent to the crime. See e.g., People v. Hanselman (1888) 76 Cal. 460, 18 P. 425.
[16] Topolewski v. State (1906) 130 Wis. 244, 109 N.W. 1037.
[17] Topolewski v. State, 109 N.W. at page 1037.
[18] Topolewski v. State, 109 N.W. at page 1041. The facts the court remanded the cause for a new trial and commented the crime was "not fully consummated" suggest the court might have been willing to affirm a conviction for attempted larceny. There is no way of knowing because upon retrial on the same evidence the case was dismissed. See Topolewski v. Plankinton Packing Co. (1910) 143 Wis. 52, 126 N.W. 554, 556.
[19] State v. Mehozonek, 8 Ohio App.3d 271, 456 N.E.2d 1353.
[20] State v. Mehozonek, 456 N.E.2d at page 1354.
[21] See footnotes 16-18, above.
[22] State v. Mehozonek, 456 N.E.2d at page 1358.
[23] State v. Mehozonek, 456 N.E.2d at page 1355.
[24] State v. Mehozonek, 456 N.E.2d at page 1356; and see cases cited.
[25] People v. Frank (City Ct. of Utica 1941) 176 Misc. 416, 27 N.Y.S.2d 227.
[26] People v. Frank, 27 N.Y.S.2d at pages 228-229.
[27] People v. Frank, 27 N.Y.S.2d at page 229, citing cases.
[28] See footnotes 16-27, supra.
[29] People v. Werner, 16 Cal.2d 216, 105 P.2d 927.
[30] People v. Werner, 16 Cal.2d at page 225, 105 P.2d 927.
[31] People v. Camodeca, 52 Cal.2d at page 147, 338 P.2d 903.
[32] People v. Camodeca, 52 Cal.2d at page 145, 338 P.2d 903.
[33] People v. Camodeca, 52 Cal.2d at page 147, 338 P.2d 903. For a discussion of the difference between a legal and a factual impossibility as it relates to attempts see Hall, General Principles of Criminal Law (2d ed.1960) pages 586-599.
[34] Section 664; People v. Camodeca, 52 Cal.2d at page 145, 338 P.2d 903 (defining attempts).
[35] People v. Camodeca, 52 Cal.2d at page 147, 338 P.2d 903.
[36] People v. Werner, 16 Cal.2d at page 225, 105 P.2d 927; emphasis added.
[37] People v. Camodeca, 52 Cal.2d at page 146, 338 P.2d 903; and see People v. Valdez (1985) 175 Cal.App.3d 103, 111, 220 Cal.Rptr. 538.
[38] People v. Camodeca, 52 Cal.2d at page 147, 338 P.2d 903.
[39] See the example of the candy jar, above, page 8 and the account of Jean Valjean and the silver plates in Hugo, Les Miserables, (Barnes and Noble ed.1996) (pages 63-90).
[40] People v. Davis, 19 Cal.4th at page 307, 79 Cal.Rptr.2d 295, 965 P.2d 1165. There are exceptions to this rule allowing conviction for larceny even though the defendant's intent was to deprive the owner of her property only temporarily if the temporary deprivation had the same effect as a permanent deprivation. (Ibid.; and see People v. Avery (2002) 27 Cal.4th 49, 55-57, 115 Cal.Rptr.2d 403, 38 P.3d 1.) While we believe the nature-of-the-consent theory can properly be applied to these exceptional circumstances this issue is not raised in the present appeal.
[41] People v. Davis, 19 Cal.4th at page 305, 79 Cal.Rptr.2d 295, 965 P.2d 1165; 3 Wharton's Criminal Law (15th ed. 1995) Larceny, section 343, page 350.
[42] People v. Davis, 19 Cal.4th at pages 303-304, 79 Cal.Rptr.2d 295, 965 P.2d 1165.
[43] People v. Davis, 19 Cal.4th at page 305, 79 Cal.Rptr.2d 295, 965 P.2d 1165.
[44] People v. Davis, 19 Cal.4th at page 306, 79 Cal.Rptr.2d 295, 965 P.2d 1165.
[45] People v. Davis, 19 Cal.4th at page 317, 79 Cal.Rptr.2d 295, 965 P.2d 1165.
[46] People v. Davis, 19 Cal.4th at pages 306, 317-318, 79 Cal.Rptr.2d 295, 965 P.2d 1165.
[47] United States v. Manarite (9th Cir.1995) 44 F.3d 1407.
[48] United States v. Manarite, 44 F.3d at pages 1410-1411, 1417.
[49] United States v. Manarite, 44 F.3d at page 1417.
[50] United States v. Manarite, 44 F.3d at page 1417.
[51] See People v. Camodeca, 52 Cal.2d at page 147, 338 P.2d 903 and discussion above, at page 841.
[52] Cases like Jean Valjean's, in which the purported victim actually consented to a permanent deprivation of his property, would be exceedingly rare. (See fn. 39, above.)
[53] Under section 664, subdivision (a) a person convicted of attempted theft is subject to only half the punishment of a person convicted of a completed theft.
[54] See discussion at page 841, above.
[55] People v. Camodeca, 52 Cal.2d at page 147, 338 P.2d 903.
[56] People v. Davis, 19 Cal.4th at page 304, 79 Cal.Rptr.2d 295, 965 P.2d 1165, and see discussion supra, pages 844-845.
[57] Cf. People v. Davis, 19 Cal.4th at page 305, 79 Cal.Rptr.2d 295, 965 P.2d 1165 with People v. Camodeca, 52 Cal.2d at page 145, 338 P.2d 903.
[58] See footnote 15, above.
[59] People v. Hanselman, 76 Cal. 460, 18 P. 425.
[60] People v. Hanselman, 76 Cal. at page 462, 18 P. 425.
[61] People v. Hanselman, 76 Cal. at pages 462-463, 18 P. 425.
[62] People v. Hanselman, 76 Cal. at page 464, 18 P. 425. Hanselman's conviction was reversed on other grounds. (Id. at page 461, 18 P. 425.)
[63] See People v. Watson, 22 Cal.4th at page 224, 91 Cal.Rptr.2d 822, 990 P.2d 1031 discussed below.
[64] It could be argued, we suppose, that meting out more severe punishment to those arrested in passive stings encourages the police to engage in passive, as opposed to active, stings thus, among other things, reducing the risk of harm to the participants and the public, (see discussion of defendants' firearm use enhancement below), and eliminating the entrapment defense (see People v. Watson, 22 Cal.4th at pages 223-224, 91 Cal.Rptr.2d 822, 990 P.2d 1031). We believe, however, the choice of law enforcement techniques is better left to law enforcement officers so long as the techniques are within constitutionally and statutorily prescribed boundaries.
[***] See footnote *, ante.
[72] The jury was instructed on the defense of entrapment and rejected it.
[73] People v. Barraza (1979) 23 Cal.3d 675, 153 Cal.Rptr. 459, 591 P.2d 947.
[74] People v. Barraza, 23 Cal.3d at pages 689-690, 153 Cal.Rptr. 459, 591 P.2d 947; footnote omitted.
[75] People v. Barraza, 23 Cal.3d at page 688, 153 Cal.Rptr. 459, 591 P.2d 947.
[76] People v. Barraza, 23 Cal.3d at pages 690-691, 153 Cal.Rptr. 459, 591 P.2d 947; footnote omitted.
[77] People v. Barraza, 23 Cal.3d at page 690, 153 Cal.Rptr. 459, 591 P.2d 947; footnote omitted.
[78] People v. Barraza, 23 Cal.3d at pages 688, 690-691, 153 Cal.Rptr. 459, 591 P.2d 947.
[79] People v. Barraza, 23 Cal.3d at pages 688, 690, 153 Cal.Rptr. 459, 591 P.2d 947.
[80] People v. Watson, 22 Cal.4th at page 224, 91 Cal.Rptr.2d 822, 990 P.2d 1031.
[81] People v. Wesley (1990) 224 Cal.App.3d 1130, 1138, 1142-1144, 274 Cal.Rptr. 326; and see People v. Ervin (2000) 22 Cal.4th 48, 85-86, 91 Cal.Rptr.2d 623, 990 P.2d 506, People v. Holloway (1996) 47 Cal.App.4th 1757, 1767, 55 Cal.Rptr.2d 547.
[82] People v. Wesley, 224 Cal.App.3d at page 1144, 274 Cal.Rptr. 326, quoting from People v. Isaacson (1978) 44 N.Y.2d 511, 406 N.Y.S.2d 714, 719, 378 N.E.2d 78.
[83] People v. Wesley, 224 Cal.App.3d at page 1144, 274 Cal.Rptr. 326.
[84] People v. Watson, 22 Cal.4th at page 223, 91 Cal.Rptr.2d 822, 990 P.2d 1031.
[85] People v. Peppars (1983) 140 Cal.App.3d 677, 686, 189 Cal.Rptr. 879.
[86] See discussion in Part I, above.
[87] People v. Cunningham (2001) 25 Cal.4th 926, 1000, 108 Cal.Rptr.2d 291, 25 P.3d 519.
[88] People v. Cunningham, 25 Cal.4th at page 1001, 108 Cal.Rptr.2d 291, 25 P.3d 519.
[89] See Part V, above.
[90] People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243.
[91] People v. Robertson (1982) 33 Cal.3d 21, 36-37, 188 Cal.Rptr. 77, 655 P.2d 279.
[92] Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.
[93] The constitutionality of CALJIC No. 17.41.1 is before our Supreme Court in several cases including People v. Taylor (S088909) review granted August 23, 2000.
[94] Health and Safety Code section 11370.4, subdivision (e) states: "Notwithstanding any other provision of law, the court may strike the additional punishment for the enhancements provided in this section if it determines that there are circumstances in mitigation of the additional punishment and states on the record its reasons for striking the additional punishment."
[95] The Eleventh Circuit appears to be the only exception. (United States v. Williams (11th Cir.1992) 954 F.2d 668, 673; but see United States v. Sanchez (11th Cir.1998) 138 F.3d 1410, 1414.)
[96] State v. Rael (1999) 127 N.M. 347, 981 P.2d 280, 286-287; State v. Thornton (Tenn. Crim.App.1999) 10 S.W.3d 229, 244; Com. v. Petzold (Pa.Super.Ct.1997) 701 A.2d 1363, 1365-1366; cf. People v. Isaacson, 406 N.Y.S.2d at page 720, 378 N.E.2d 78 (conviction reversed where among other things police lured Pennsylvania resident into New York for drug buy because of New York's tougher sentencing laws).
[97] Some courts use the term "sentence entrapment" and "sentence manipulation" interchangeably (see e.g., United States v. Staufer (9th Cir.1994) 38 F.3d 1103, 1106) but "sentence entrapment" is better understood to refer to a case in which the defendant, although predisposed to commit a minor offense, is entrapped into committing a greater offense subject to greater punishment. (See United States v. Sanchez, 138 F.3d at page 1414.) As pointed out in People v. Graves (2001) 93 Cal.App.4th 1171, 1179, 113 Cal. Rptr.2d 708, the concept of "sentence entrapment" does not fit with California's criminal law because we do not use the same definition of "entrapment" as the federal courts (see People v. Barraza, supra, 23 Cal.3d at pages 690-691, 153 Cal.Rptr. 459, 591 P.2d 947) nor do we follow the same rigid sentencing guidelines as federal courts.
[98] Section 1170, subdivision (a)(1) (emphasis added); and see Epstein, The Growth and Complexity of the Law of Punishment (March 2002) Los Angeles Lawyer at page 37.
[99] See United States v. Staufer, 38 F.3d at pages 1107-1108 (vacating defendant's sentence for "sentence entrapment.")
[100] Rochin v. California (1952) 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183.
[101] California Constitution, article III, section 3.
[102] The threat to the separation of powers doctrine is by no means one of our imagining. Numerous commentators have pointed out the increasing frequency of sting operations. It is these operations which most often provide the police with the opportunity to engage in pre-arrest sentence manipulation. (See, e.g., Note, When Discretion Leads To Distortion: Recognizing Pre-Arrest Sentence-Manipulation Claims Under The Federal Sentencing Guidelines, (1996) 94 Mich. L.Rev. 2385, 2396; Underhill, Sentence Entrapment: A Casualty Of The War On Crime, 1994 Ann. Surv. Am. L. 165, 165-166.)
[103] Manduley v. Superior Court (2002) 27 Cal.4th 537, 552, 117 Cal.Rptr.2d 168, 41 P.3d 3 (internal quotation marks and citations omitted).
[104] Superior Court v. County of Mendocino (1996) 13 Cal.4th 45, 52-53, 51 Cal.Rptr.2d 837, 913 P.2d 1046.
[105] Wolff v. McDonnell (1974) 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935.
[106] We recognize it can be argued the dangers posed by pre-arrest sentence manipulation are reduced if not eliminated in California by the trial court's power to strike the quantity enhancement under section 11370.4, subdivision (e) "if it determines that there are circumstances in mitigation" and the requirement in the case of conspirators "the defendant conspirator was substantially involved in the planning, direction, execution, or financing of the underlying offense." (§ 11370.4, subds.(b), (c).) We explain below why these protections, by themselves, do not cure the problems caused by pre-arrest manipulation of sentences. See pages 856-857, below.
[107] See e.g., United States v. Lacey (10th Cir. 1996) 86 F.3d 956, 963.
[108] See e.g., United States v. Montoya (1st Cir. 1995) 62 F.3d 1, 4-5.
[109] United States v. Shephard (8th Cir. 1993) 4 F.3d 647, 649. In United States v. Lacey, 86 F.3d at page 966 the court suggests activities not "in furtherance of legitimate law enforcement objectives" are, as a matter of law, "outrageous."
[110] United States v. Hulett (8th Cir.1994) 22 F.3d 779, 781-782.
[111] Cf. Rochin v. California, 342 U.S. at page 172, 72 S.Ct. 205.
[112] Note, Making the Crime Fit the Punishment: Prearrest Sentence Manipulation By Investigators Under the Sentencing Guidelines (1994) 1994 U. Chi. Legal F. 419, 437.
[113] See discussion in Part VIII, above.
[114] Section 11370.4, subdivision (a)(4)-(6).
[115] Section 11370.4, subdivision (e).
[116] Section 11370.4, subdivisions (a), (b).
[117] California Rules of Court, rule 4.423 defining circumstances in mitigation applies to selection of the lower, middle or upper terms of the counts on which the defendant is convicted. By its terms it does not apply to enhancement decisions. (See Cal. Rules of Court, rule 4.420(a).)
[118] Just how this factor should affect the defendant's sentence is a question we discuss below at page 857.
[119] See United States v. Lacey, 86 F.3d at page 963.
[120] Cf. United States v. Connell (1st Cir. 1992) 960 F.2d 191, 195-196; United States v. Rosen (1st Cir. 1991) 929 F.2d 839, 843.
[121] United States v. Sanchez, 138 F.3d at page 1414.
[122] United States v. Sanchez, 138 F.3d at page 1412.
[123] United States v. Sanchez, 138 F.3d at page 1414.
[124] See United States v. Jones (4th Cir.1994) 18 F.3d 1145, 1155.
[125] As noted above, Smith received a sentence of 36 years; Thomas 47 years, eight months; and Gonzalez 33 years.
[126] People v. Arango (1993) 12 Cal.App.4th 450, 455-456, 15 Cal.Rptr.2d 629.
[127] See Wilson v. Superior Court (1987) 194 Cal.App.3d 1259, 1269, 240 Cal.Rptr. 131.